IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

### NASHVILLE, DECEMBER TERM, 1915.

LEWISBURG & N. R. Co. *v.* HINDS *et al.*

(*Nashville.* December Term, 1915.)

1. EMINENT DOMAIN. Railroads. Adjacent landowners. Consequential damages.

The common-law rule is that owners of land, no part of which has been taken for a railroad, but which land is adjacent thereto, are not entitled to compensation for damages naturally and unavoidably resulting from the proper conduct of the road, which are shared generally by owners whose lands lie within the range of the inconveniences necessarily incident to proximity to a railroad, including noises and vibrations incident to running trains, the necessary emission of smoke and sparks, and similar annoyances. (*Post, pp.* 305-310.)

Cases cited and approved: Northern Transp. Co. v. Chicago, 99 U. S., 635; Beseman v. Penn. R. Co., 50 N. J. Law, 235; Richards v. Washington Terminal Co., 233 U. S., 546; Railroad v. Bing-

134 Tenn.]           (293)

Railroad v. Hinds.

ham, 87 Tenn., 522; Harmon v. Railroad, 87 Tenn., 614; Chatta-
nooga v. Dowling, 101 Tenn., 342; Brumit v. Railroad, 106 Tenn.,
124; Terminal Co. v. Jacobs, 109 Tenn., 727; Terminal Co. v.
Lellyett, 114 Tenn., 368;  Gossett v. Railroad, 115 Tenn., 376;
Coyne v. Memphis, 118 Tenn., 651.

Code cited and construed:   sec. 1857 (S.).

2. **EMINENT DOMAIN.**  "Damages."  Rule for assessment.

The word "damages," as used in Shannon's Code, sec. 1857, regu-
lating assessment of damages, does not mean money exacted
by retributive justice for a legal injury inflicted, but purchase
money for a property taken, pursuant to law, and compensa-
tion for loss in value incidentally imposed upon the rest of the
tract as a consequence of the taking of a part, and in fixing
such compensation the owner of the land must be treated as
one offering it for sale at a fair price, while not under any
stress of circumstances that would induce him to sacrifice his
property, and the condemnor as an intending buyer, likewise
free from stress, as not being forced to buy.  (*Post, pp.* 310-313.)

Cases cited and approved:   Wray v. Railroad, 113 Tenn., 544;
Woodfolk v. Railroad, 32 Tenn., 422; City of Memphis v. Bolton,
56 Tenn., 508; Alloway v. Nashville, 88 Tenn., 510; Wray v.
Railroad, 113 Tenn., 544; So. Ry. Co. v. City of Memphis, 126
Tenn., 267; So. Ry. Co. v. Michaels, 126 Tenn., 702; Idaho-Wes-
tern Ry. Co. v. Columbia Conference, 20 Idaho, 568.

3. *EMINENT DOMAIN.  Railroads.  Consequential damages.*

The compensation which the landowner is entitled to recover for
the diminution of the value of the land remaining after the
condemnation of a part is not restricted to damages arising
from the construction and location of a railroad, but he is entitled
to consequential damages arising from the operation of the
road, whereby such remaining property is lessened in value,
including danger of fire, probable annoyance from noise, smoke,
cinders, dust, odors, or vapors from engines, the jarring caused
by the passing of trains upon the track over the land taken,
and anything which would, in an appreciable degree, capable of

Railroad v. Hinds.

ascertainment in money, injure the market value of the land left. (*Post, pp.* 313, 326.)

Cases cited and approved: Blesch v. Railroad Co., 48 Wis., 188; Concord R. R. Co. v. Greely, 23 N. H., 237; Railroad v. Stickney, 150 Ill., 362; Railroad v. Church, 104 N. C., 531; Railroad v. Ball, 5 Ohio St., 575; Paducah & Memphis R .R. Co. v. Stovall, 59 Tenn., 1; Acker v. Knoxville, 117 Tenn., 224; Kersey v. Schuylkill River East Side R. Co., 133 Pa., 234; Little Rock, etc., Ry. Co. v. Allen, 41 Ark., 431; Elizabeth, etc., R. R. Co. v. Combs, 10 Bush. (Ky.), 382; Chicago, etc., R. R. Co. v. Atterbury, 156 Ill., 281; Matter of N. Y. etc., R. R. Co., 15 Hun., (N. Y.), 63; Comstock v. Clearfield, etc., Ry. Co., 169 Pa., 582; Weyer v. Chicago, etc., R. R. Co., 68 Wis., 180; Railroad v. Nix, 137 Ill., 141; Railroad v. M'Comb, 60 Me., 290; County of Blue Earth v. Railroad, 28 Minn., 503; Bowen v. Railroad, 17 S. C., 574; Tidewater v. Shartzer, 107 Va., 562; Railroad v. Columbia Conference, 20 Idaho, 568; Railroad v. Williams, 133 Ga., 679; Railroad v. Doney, 3 Kan. App., 515; Railroad v. Tidrick, 137 Ill. App., 553; Railroad v. McAuliff, 43 Kan., 187; Sabin v. Railroad, 25 Vt., 370; Shano. v. Bridge Co., 189 Pa., 246; Railroad v. Raine, 114 Tenn., 569; Railroad v. Todd, 39 Neb., 818; Vaulx v. Railroad, 120 Tenn., 316; Hord v. Railroad, 122 Tenn., 399.

Cases cited and distinguished: Railroad v. Stovall, 59 Tenn., 1, 3, 4; Wray v. Railroad, 113 Tenn., 557.

Code cited and construed: Sec. 1857 (S.).

4. EMINENT DOMAIN. Railroads. "General damages."

In condemnation of land for a railroad, the term "general damages" may be defined as damages common to the entire community through which the railroad runs, and which do not directly and proximately result from the taking of the right of way strip and the proper construction and proper operation thereon of the railroad. (*Post, pp.* 326-333.)

Cases cited and approved: Chicago v. Burcky, 158 Ill., 103; Miller v. Schenck, 78 Iowa, 372-375; Sheedy v. Union Press Brickworks, 25 Mo. App., 527; Thomas v. Intercounty St. Ry., 167

Pa., 120; Flynn v. Taylor, 127 N. Y., 596; I. C. R. R. Co. v. Trustees of Schools, 212 Ill., 406.

Cases cited and distinguished: Wylie v. Elwood, 134 Ill., 281; Aldrich v. Wetmore, 52 Minn., 164; In Re Melon Street, 182 Pa., 397; Penn. R. R. Co.'s Appeal, 115 Pa., 514; Bangor & P. R. R. Co. v. McComb, 60 Me., 290; Walker v. Old Colony & Newport Ry. Co., 103 Mass., 10.

5. **EMINENT DOMAIN. Railroads. General damages.**

A landowner, part of whose land is condemned for a railroad, is entitled to such general damages as are suffered by all persons within the range of the annoyances necessarily arising from the proper operation of a railroad, in so far as such matters arise from operation over the portion of his land condemned and actually impair the market value of that part of the land remaining, though the law affords no remedy to adjacent landowners similarly affected by such annoyances, no part of whose land is condemned, since, considered as having the liberty of contract, the owner may, in fixing his price, protect himself against such matters as to which the law would not otherwise afford him redress, while the adjacent owner, being without the purview of the constitutional provision providing compensation for property taken by condemnation, is left to the common law, which affords him no remedy against such general damages. (*Post, pp.* 333-339.)

Case cited and distinguished: Blesch v. Chicago & Northwestern Ry. Co., 48 Wis., 168.

6. **EVIDENCE. Eminent domain. Owner's previous offer of sale. Discretion.**

On the issue of damages in a proceeding in eminent domain by a railroad company, the exclusion of the testimony of a witness that the owner of the land, part of which was condemned, had several years previously stated that the land could be bought for $30,000, where such offer was made at a time when the real estate market was dead and before any improvements had been made upon a neighboring tract, which was later converted into

a park, and before a boulevard had been projected along the
tract, was not an abuse of the trial court's discretion. (*Post*,
*pp.* 339, 340.)

7. EVIDENCE.   Eminent domain.   Price of neighboring tract
bought for park.   Discretion.

The refusal of the trial judge to permit evidence as to the pur-
chase price of the tract bought for such park, which was pur-
chased several years previously to such condemnation, the
subsequent creation of such park and the boulevard having
greatly enhanced property values in the vicinity, was not an
abuse of discretion. (*Post, p.* 340.)

8. EVIDENCE.   Railroads.   Condemnation.   Nearby land.   Pur-
chase price. Discretion.

The exclusion in such condemnation proceeding of evidence of
the price paid for a neighboring tract of land several years pre-
viously, where the establishment of such park and boulevard
had made communication between such tract and a city much
better, and had enhanced the value thereof, and the land had
been purchased at what amounted to a forced sale by reason
of financial difficulties of the then owners, was not an abuse of
discretion. (*Post, pp.* 341, 342.)

9. EVIDENCE.   Eminent domain.   Damages.   Other sales.   Ad-
missibility.

In arriving at the value of land taken by eminent domain, evi-
dence of other sales is generally competent. (*Post, p.* 342.)

Case cited and distinguished:   Union Railway Co. v. Hunton, 114
Tenn., 609.

10. APPEAL AND ERROR.   Evidence.   Other sales.   Discretion.
Review.

The extent to which other sales of land are admissible to prove
the value of the land in controversy, in proceedings in eminent
domain, with regard to the degree of similarity of situation and
circumstances necessary to give such sales sufficient probative
value, is largely within the trial court's discretion, but such dis-
cretion is not unlimited, and will in proper cases be reviewed
on appeal. (*Post, pp.* 342, 343.)

Cases cited and approved:   St. L., etc., Ry. Co. v. Guswelle, 236 Ill., 214; Chandler v. Jamaica Pond Acqueduct Co., 122 Mass., 305; Amory v. Melrose, 162 Mass., 556; Watson et al. v. Mil. & Mont. R. R. Co., 57 Wis., 350; Stinson v. Chicago, St. P. & M. Ry. Co., 27 Minn., 284; Seattle & Montana Ry. Co. v. Gilchrist, 4 Wash., 509.

11.  **EMINENT DOMAIN. Damages. Appeal. Defective bond. Motion to dismiss appeal. Laches.**

In a railroad's condemnation proceeding, plaintiff appealed from the report of the jury of view, and obtained an order to take possession upon giving bond.   Defendant landowners also excepted on the ground that the award was inadequate, and, the exceptions being overruled, took an appeal, which was granted in the name of all the defendants on condition that they file an appeal bond for costs.  Some three years later, when the case came up for trial, the parties stipulated that the only question was the value of the land taken and the amount of damages.  After a month's trial, involving the examination of fifty witnesses, and after the testimony was closed and the case fully argued, plaintiff moved to dismiss the appeal because defendants' appeal bond had not been executed by all the parties defendant.   Plaintiff admitted discovering the defect two weeks previous to the time of making the motion.  *Held,* that the motion was properly overruled because it came too late.  (*Post, pp.* 344-346.)

Cases cited and approved:   Gillespie v. Goddard, 48 Tenn., 777; Tedder v. Odom, 49 Tenn., 50; Staub v. Williams, 2 Leg. Rep., 183; Snyder v. Summers, 69 Tenn., 481; Morris v. Smith, 30 Tenn., 135; Adamson v. Hurt, 3 Shan. Cas., 424; Staub v. Williams, 69 Tenn., 36; Wilson v. Corry, 69 Tenn., 391; La Follette v. Road Comm's., 105 Tenn., 536; Jones v. Ducktown, etc., Co., 109 Tenn., 375.

12.  **EMINENT DOMAIN.   Damages.   Appeal.   Defective bond. Amendment.    Discretion.**

Under such circumstances it was a proper exercise of the trial court's discretion to allow defendants to amend such bond by the insertion of the necessary names. (*Post, pp.* 344-346.)

Railroad v. Hinds.

13. **APPEAL AND ERROR.** Harmless error. Cross-examination.

Where, in a railroad's condemnation proceeding, plaintiff's witness testified that defendant's land would be benefited by the railroad because it could be used for factory sites, permitting defendant to prove by the witness on cross-examination that the railroad was a departmental line of a trunk line road, to be used to transport fast through freight trains around the city without entering the terminals, from which it would be inferred that there would be no stops made on plaintiff's land, was harmless error, where it was not contended that there were any incidental benefits to defendant landowner, and no controversy existed as to the right of condemnation. (*Post, pp.* 346, 347.)

14. **EMINENT DOMAIN.** Damages. Withholding land from sale. Purpose. Admissibility.

In such proceeding, evidence by one of the landowners that his his reason for not making any effort to sell the land for twenty-five years was that the land was held because of flattering prospects of increase in value was properly admitted, since it was relevant for the purpose of meeting the inference which might be drawn from the otherwise unexplained fact that the land had been held from the market for so long a period. (*Post, pp.* 347, 348.)

15. **APPEAL AND ERROR.** Specification of error. Insufficiency.

The specification of error that in such proceeding the court permitted defendant to cross-examine a witness and require him to detail what had been done with a tract of land near another city, and that he was further allowed to tell how the tract involved in the case at bar could be platted for residence seekers, etc., was insufficient under supreme court rule 14, subd. 3 (126 Tenn., 722, 160 S. W., ix), that a specification on the admission or rejection of evidence must quote the full substance thereof, with a citation of the record where the evidence and ruling may be found. (*Post, p.* 348.)

16. **APPEAL AND ERROR.** Specification of error. Insufficiency.

The further specification that the court permitted defendant to

assume that the witness was arguing the case with him and was evincing partiality, whereupon the court stated that the questions asked were proper, was insufficient for the same rea-són, since such statement was not a statement of the substance of such questions, but merely the conclusion of counsel as to their effect. (*Post, p.* 348.)

17. **WITNESSES.   Cross-examination.   Scope.**

Where, in a railroad's condemnation proceeding, one of its witnesses testified to the impossibility of making proper streets over defendants' land for the purposes of platting and subdivision, as bearing on the question of the value of the land, it was proper to permit the landowner, on cross-examination, to require the witness to detail the platting of a tract of land near another city, and to tell how defendants' land could be modeled, outlined, and platted for residence seekers. (*Post, pp.* 348, 349.)

18. **CERTIORARI.   Petition.   Specification of error.   Evidence.   Defective assignment.**

On *certiorari* to review the judgment of the court of civil appeals in condemnation proceeding, the specification of error that the court allowed defendant to testify that inferior buildings adjacent to the neighboring park would not detract from the value of defendants' property, nor prevent the park from contributing to the desirability of defendants' land as a residence district, *held* insufficient, where there was no statement of objections made to the evidence and no reason given showing a *prima facie* case of error, as required by supreme court rule 12 (126 Tenn.. 720, 160 S. W. viii), relating to petitions for *certiorari* to remove cases from the civil court of appeals to the supreme court for review. (*Post, p.* 349.)

19. **WITNESSES.   Cross-examination.   Producing for first time on rebuttal.   Diligence.**

In such condemnation proceeding, where plaintiff offered a new witness in rebuttal, permitting defendant on cross-examination to question the witness concerning his relation by marriage to one employed by plaintiff, and the interest of such person in

Railroad v. Hinds.

property adjacent to the proposed road, for the purpose of showing plaintiff's familiarity with the witness as bearing on the failure to use diligence in producing such witness on plaintiff's original evidence, was not prejudicial to plaintiff. (*Post, pp.* 349-351.)

20. **APPEAL AND ERROR. Harmless error. Cross-examination. Improper statement by court.**

Where, in such proceeding, a witness to incidental damages, when cross-examined by plaintiff as to how he arrived at a certain amount as representing the damages, persistently answered that he thought such figure was correct, it was harmless error for the trial court, in stopping such cross-examination, to remark that the witness had answered a number of times that such was his estimate, and that it was not perceived how he could answer it in any other way. (*Post, pp.* 351, 352.)

21. **WITNESSES. Stopping cross-examination. Discretion.**

The stopping of such cross-examination was not an abuse of the trial court's discretion to check cross-examination. (*Post, pp.* 351, 352.)

22. **EMINENT DOMAIN. Taking part of tract. Excessive damages.**

On appeal from an award to the landowner, in a railroad's condemnation proceeding, of $5,775 as the value of a strip of two and thirty-one one-hundredths acres taken for a right of way through a fifty-six-acre tract of land lying near Shelby Park in East Nashville, and of $32,000 for incidental damages, where the testimony as to the amount of damages showed an astonishing contrariety of opinion, not only as between the opposing witnesses but as between witnesses on the same side, so as to show that the opinions expressed were essentially uncertain and not very reliable, *held* that justice required a remittitur of $10,000 in reduction of such damages. (*Post, pp.* 352-369.)

Cases cited and approved: Woodfolk v. N. & C. R. R. Co., 32 Tenn., 422; Vaulx v. Railroad, 120 Tenn., 316; Hord v. Railroad, 122 Tenn., 399; Railroad v. Stovall, 59 Tenn., 1, 3,

Railroad v. Hinds.

4; Harmon v. Railroad, 87 Tenn., 614; Chattanooga v. Dowling, 101 Tenn., 342; Brumit v. Railroad, 106 Tenn., 124; Terminal Co. v. Jacobs. 109 Tenn., 727; Terminal Co. v. Lellyett, 114 Tenn., 368; Gossett v. Railroad, 115 Tenn., 376; Coyne v. Memphis, 118 Tenn., 651.

Case cited and distinguished: Railroad v. Bingham, 87 Tenn., 522.

Codes cited and construed: Secs. 1844, 1856, 1857 (S.).

Constitution cited and construed: Sec. 21, art. 1.

FROM DAVIDSON

Appeal from the Circuit Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.— THOS. E. MATTHEWS, Judge.

KEEBLE & SEAY and F. M. BASS, for plaintiff.

PITTS & McCONNICO, J. WESLEY GAINES, JR., and M. S. Ross, for defendant.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This was a condemnation proceeding, instituted in the circuit court of Davidson county, for the purpose of appropriating to the use of the railroad company a right of way through a fifty-six-acre tract of land, lying immediately north of, and alongside of, Shelby

Railroad v. Hinds.

Park, in East Nashville. A jury of view was appointed in the usual way, a report made, an appeal from the finding of the jury to a trial by a regular jury, a verdict by the latter, and the assessment of damages, both for the land taken and for incidental damages to the residue of the tract. The amount allowed for the value of the two and thirty-one one-hundredths acres taken for the right of way was $5,775. For incidental damages the jury allowed $32,000, making the entire sum $37,775, covering the value of the land actually taken and incidental damages, as stated. An appeal was prosecuted to the court of civil appeals, and the judgment of the trial court on the verdict was affirmed. The case was then brought to this court by the writ of *certiorari*, and numerous errors assigned by the railway company.

The chief question concerns the measure to be applied in this State for the ascertainment of incidental damages.

Without, for the present, taking up the special errors assigned we shall state our conclusions upon the general subject.

The parties widely differ in their theories. The defendants claim that any injury which directly causes depreciation in the market value is a damage within the true sense and scope of the right vouchsafed by law to recover compensation for injuries inflicted by the erection of a public improvement on part of the land of an owner.

Plaintiff insists that in order to arrive at the nature of damages peculiar to the land involved, we are bound to exclude damages similar in nature to those suffered by mere adjacent owners, no part of whose land has been taken, and that this would exclude mere propinquity of the railroad, damage of fire, noise, smoke, cinders, dust, and vibration; that these are general damages as distinguished from special damages, and therefore necessarily excluded from consideration. The plaintiff supports this position by the further contention that, inasmuch as the neighboring owners referred to, though they occupy the same relative local adjacency in respect of the improvement as do those a part of whose land has been taken, are not entitled to damages under our law, and therefore an allowance to the former, while denying relief to the latter, would operate as an unjust discrimination, and is not therefore to be tolerated.

The reply of defendants is twofold: First, that the claimed discrimination does not exist, since, as they assert, mere adjacent owners are entitled to the same kind of damages, for the same kind of injuries, at least for noise, smoke, cinders, dust, and vibration; secondly, that the term "general damages" embraces only those inconveniences which impair personal comfort and enjoyment as distinguished from those invasions which affect the use and value of land, instancing, among the former, the ordinary noises created by the operation of the improvements which offends the ears of all, whether they own and reside upon land in the neighborhood or not; as, for example, the noise caused by the rum-

ble of trains, the rattle of vehicles on the paved streets of a city, noise of passing street cars, and the smoke of distant factories.

So, it is obvious that the defendants take their stand upon the broad proposition that every direct impairment of the market value of the land left after a part of the whole tract has been taken, caused by the installation and nonnegligent operation of the improvement, must be considered as an item of incidental damages, and be compensated for as such; while the plaintiff's contention is that the impairment of market value is not a true criterion, but the loss must arise from some physical, observable fact, or facts, special and peculiar to the land so left, as differentiated from other tracts or lots through which, or near to which, the improvement is located and operated; instances of such distinguishing physical features being the shape in which the land is left by the appropriation of a part of it, the separation of a whole tract into two or more parts, the existence of cuts and fills making it more difficult to use the separate parts, cutting off the owner from easy access to his barn or other outhouses, caused by the interposition of the railway between his dwelling and such structures, the diversion of waterways, the destruction of springs, the impairment of access to a public road or street, and the like.

We do not desire to incumber the present discussion with any extended consideration of the rights of adjacent owners, no part of whose land has been taken.

134 Tenn. 20

There are two important theories upon this question, upon which the authorities are at variance. One of these is that any interference which impairs the value of adjacent property is a taking, and is to be compensated for as such; the other is that the interference must amount to a nuisance before relief can be granted. We adopt from a very recent decision of the supreme court of the United States the common-law rule, as we understand it, governing the rights of mere adjacent owners, no part of whose property has been taken for the public improvement, in respect of mere consequential damages:

"Any diminution of the value of property not directly invaded nor peculiarly affected, but sharing in the common burden of incidental damages arising from the legalized nuisance, is held not to be a 'taking' within the constitutional provision. The immunity is limited to such damages as naturally and unavoidably result from the proper conduct of the road and are shared generally by property owners whose lands lie within range of the inconveniences necessarily incident to proximity to a railroad. It includes the noises and vibrations incident to the running of trains, the necessary emission of smoke and sparks from the locomotives, and similar annoyances inseparable from the normal and nonnegligent operation of a railroad. *Northern Transp. Co. v. Chicago,* 99 U. S., 635, 641, 25 L. Ed. 336, 338; *Beseman v. Pennsylvania R. Co.,* 50 N. J. Law, 235, 240, 13 Atl. 164, affirmed in 52 N. J. Law, 221, 20 Atl., 169. That the constitutional inhibition against the

taking of private property for public use without com-
pensation does not confer a right to compensation up-
on a landowner, no part of whose property has been ac-
tually appropriated, and who has sustained only those
consequential damages that are necessarily incident to
proximity to the railroad, has been so generally recog-
nized that in some of the States (Arkansas, California,
Colorado, Georgia, Illinois, Louisiana, Mississippi, Mis-
souri, Montana, Nebraska, North Dakota, South Dako-
ta, Texas, West Virginia, and Wyoming are, we believe,
among the number) constitutions have been established
providing, in substance, that private property shall not
be taken or damaged, for public use without compensa-
tion. The immunity from liability for incidental inju-
ries is attended with a considerable degree of hardship
to the private landowner, and has not been adopted
without some judicial protest. But, as pointed out by
Chief Justice Beasley in the *Beseman Case,* 50 N. J.
Law, at page 238 (13 Atl., 164), if railroad companies
were liable to suit for such damages upon the theory
that with respect to them the company is a tort-feasor,
the practical result would be to bring the operation of
railroads to a standstill. And, on the whole, the doc-
trine has become so well established that it amounts to
a rule of property, and should be modified, if at all, only
by the lawmaking power. But the doctrine, being
founded upon necessity, is limited accordingly." *Rich-
ards* v. *Washington Terminal Co.,* 233 U. S., 546, 554,
34 Sup. Ct., 654, 657, 58 L. Ed., 1088, 1092 (L. R. A.,
1915A, 887).

Our own authorities are in substantial accord. *Railroad* v. *Bingham,* 87 Tenn., 522, 11 S. W., 705, 4 L. R. A., 622; *Harmon* v. *Railroad,* 87 Tenn., 614, 11 S. W., 703; *Chattanooga* v. *Dowling,* 101 Tenn., 342, 47 S. W., 700; *Brumit* v. *Railroad,* 106 Tenn., 124, 60 S. W., 505; *Terminal Co.* v. *Jacobs,* 109 Tenn., 727, 72 S. W., 954, 61 L. R. A., 188; *L. & N. Terminal Co.* v. *Lellyett,* 114 Tenn., 368, 85 S. W., 881, 1 L. R. A. (N. S.), 49; *Gossett* v. *Railroad,* 115 Tenn., 376, 89 S. W., 737, 1 L. R. A. (N. S.), 97, 112 Am. St. Rep., 846; *Coyne* v. *Memphis,* 118 Tenn., 651, 102 S. W., 355, and cases cited. The cases in other jurisdictions to the same purport are so numerous that we shall not attempt to cite them.

Relief is granted in several States under constitutions and statutes which authorize recoveries when any property has been "damaged" or "injured" by a public improvement, and in England where land has been "injuriously affected." Among these States are those mentioned in *Richards* v. *Washington Terminal Co.,* and, in addition, we believe, the States of Oklahoma, Virginia, Washington, Minnesota, Kentucky, and Alabama. 1 Lewis on Eminent Domain (3d Ed.), sec. 346, and note; 10 Ruling Case Law, pp. 164, 165, sec. 145.

The course of decision on this subject, in the jurisdictions referred to, is quite fully shown in sections 358-365 of the very able treatise of Mr. Lewis, just cited, and is summed up in section 356 as follows:

"Different Views Regarding the Proper Construction of the Words 'Damaged' or 'Injured.' In endeavoring to give a general interpretation to the words

'damaged' or 'injured,' as used in recent constitutions, courts have usually adopted one or the other of the following views: (1) That the words embrace only what are known as actionable damages, that is, such damages as would form the basis of an action at common law, but for the statutory authority; (2) that they embrace only damages caused by some physical injury to the property or by an interference with some private right appurtenant to the property, or of some public right, which the owner is entitled to make use of in connection with the property; (3) that they cover any loss or injury which may properly be taken into consideration in estimating damages to the balance of a tract when part is taken; (4) that they embrace any depreciation caused by the construction and operation of works for public use, no matter how occasioned. The third and fourth of these rules of construction doubtless amount to the same thing; that property is damaged whenever it is depreciated in value by the construction or operation of works for public use. The first rule is doubtless too restricted, since in some cases and in some jurisdictions it would exclude compensation for injuries, which were intended to be indemnified.''

The weight of authority, in the States having the new constitutions referred to, and in England, seems to be in favor of the second of the conclusions stated in the foregoing excerpt. We need not pursue this matter further, however, since we have no such provision in our constitution, and no statute covering that ground.

Our constitution merely guards against the taking or appropriation of private property for public use without just compensation.  Article 1, section 21.  Our statutes in terms authorize and regulate the taking of property under the right of eminent domain, providing for the assessment of damages to the owner of the land actually taken, and for the ascertainment of the damages to the rest of the land incidental upon the taking of a part, providing, as construed by our cases, in substance, that such incidental damages may be lessened by incidental benefits, and that the difference shall constitute the sum to be paid as damages to the land not taken.  Shan. Code, section 1857.  Our cases very clearly point out how the damages are to be ascertained for the land actually taken.  They are not so clear on the subject of incidental damages to the land not taken. While several elements of incidental damages have been mentioned in these cases, no adequate treatment of the matter has been attempted; but it has been said in several of the cases that the subject is inherently full of difficulty.

The difficulty, as we think, springs, in part at least from the ambiguity latent in the word ''damages,'' the two meanings, which it bears, representing concepts quite distinct.  From this viewpoint we shall consider the language of our Code.  That section (Shan. 1857) reads:

''In estimating the damages, the jury shall give the value of the land (taken) without deduction, but incidental benefits which may result to the owner by rea-

son of the proposed improvements may be taken into consideration in estimating the incidental damages.''

The word ''damages'' here used does not mean a sum of money, exacted by retributive justice for a legal injury inflicted, but purchase money for property taken, pursuant to law, for the use of a public improvement, and compensation for the loss in value incidentally imposed upon the residue of the tract as a consequence of the taking of a part. No wrong has been done, and hence no injury (*''injuria''*) in the legal sense produced, therefore there are no damages (an inapt expression, *Wray* v. *Railroad,* 113 Tenn., 544, 551, 82 S. W. 471), due in the sense in which that term is understood in actions *ex delicto*. The clearing up of this ambiguity arising from the use of the term ''damages,'' in the section referred to, relieves us, as we think, from some confusion of thought, remembering that ''damages'' in the true sense is a term indicating a monetary exaction, imposed on a wrongdoer, as a means of compelling him to make reparation to one on whom he has inflicted an injury in the legal sense, that is, a legal wrong, either upon persons or property, or by a breach of contract, which latter is in a sense an injury to a property right. The damages, so called, in the kind of case now before the court, a condemnation proceeding under the law of eminent domain, arise in a sense, and to a degree, *ex contractu,* although one of the parties is made to enter into the arrangement through compulsion of law. It is in truth almost as certainly upon a general basis of contract, as when a court of chancery undertakes to put on

the market the land of an infant, or of any other person under disability when a conversion from realty into personalty is desired as being for the best interest of such person. There is, it is true, no meeting of minds, as in the case of a typical contract, since after the condemnor indicates through proper pleadings a desire for certain realty, the State, through its courts, assumes to act for both in effecting the transfer. The principle on which it acts is that the owner of the land shall be treated as one offering it for sale, at a fair price, while not being under any stress of circumstances that would induce him to sacrifice his property, and the condemnor as an intending buyer, who is alike free from stress, as not being forced to buy. *Woodfolk* v. *N. & C. R. R. Co.*, 2. Swan (32 Tenn.), 422; *City of Memphis* v. *Sarah Bolton*, 9 Heisk. (56 Tenn.), 508, 510; *Alloway* v. *Nashville*, 88 Tenn., 510, 13 S. W., 123, 8 L. R. A., 123; *Wray* v. *Railroad*, 113 Tenn., 544, 552, 82 S. W., 471; *Southern Ry. Co.* v. *City of Memphis*, 126 Tenn., 267, 148 S. W., 662, 41 L. R. A. (N. S.), 828, Ann. Cas., 1913E, 153; *Southern Railway Co.* v. *Michaels*, 126 Tenn., 702, 708, 151 S. W., 53; *Idaho-Western Ry. Co.* v. *Columbia Conference*, 20 Idaho, 568, 119 Pac., 60, 38 L. R. A. (N. S.), 497; Lewis on Eminent Domain (3d Ed.), secs. 693, 706. "It is not in the nature of a wrongful taking, for which damages are to be assessed. Nor is it a claim for any wrong or damage done, but the appropriation of the property is legal and rightful, as much so as if the owner had voluntarily sold it to the company, and the only open question was, What is a fair price for the prop-

erty? What is its value?" *Woodfolk* v. *Railroad Co.,* supra, at page 437 of 2 Swan.

Two persons so dealing would probably reach a result whereby the land would pass from the seller to the buyer on a just appraisal. The court, through its fit agencies, a commission or a trial of the matter by a jury with the aid of witnesses, ascertains the price for both, thus completing that feature of the assumed relation. It fixes for the parties the price of the land taken, based on the value of the land, taking into consideration its shape or form, its area, and all of its capabilities or constituents of value. Authorities supra.

But at this point another element arises in the assumed negotiation. The parcel of land selected and priced is to be cut out of a larger parcel or tract. A prudent negotiator, before closing the contract, would consider how the rest of his land would be affected in value by selling off the portion desired for the uses of any given public improvement. The owner, as stated, occupies, fundamentally, though not formally, a contractual *status,* and, if acting for himself, would save himself from any loss in the latter aspect, either by adding the difference onto the price of the land sold, or by the exaction of a separate sum. The law, representing him in a condemnation proceeding, assumes the right to sell for him, both to fix the price he shall receive for the land actually used and the amount which he shall receive as compensation for the lessened value of the part not taken. As to the land to be taken, it has engaged to treat the owner from the standpoint of one

who is offering his land for sale to another who wishes to buy, as if neither were compelled to enter the transaction. Where this theory or principle is employed as a basis for effecting the transfer of the land that is to be actually used, what warrant can there be for abandoning it when that stage in the affair is reached at which it becomes necessary to estimate the impairment in value of the residue of the tract? What warrant is there for giving the single word "damages," used in section 1857 of Shannon's Code, one meaning when applied to the strip taken and another when applied to the residue of the land? If the theory be appropriate and just as a guiding principle in the one case, it is equally so with the other, since both are parts of one transaction, and the purpose is to ascertain the true amount of the compensation to be paid for the land, and for the depreciation in value of the land not taken. We do not overlook the true nature of the right of eminent domain (22 L. R. A. [N. S.], 7, 93, 94), as an exercise of sovereign power; and it may be conceded as possible that the sovereign needed not to adopt the special rule we have indicated; but that it has been adopted through a just construction of the constitution and the laws is altogether clear, and, having been adopted, it represents a principle that controls. The sovereign, under the requirements of the constitution (some authorities hold that the requirement is inherent, without regard to the constitution, but we need not go into that phase of the matter)—the sovereign, we say, being under the necessity of ascertaining the sums for compen-

sation we have mentioned, was bound to devise some plan for the execution of the purpose. The method we have indicated was adopted, and must be followed. No method was adopted for the relief of the owners of mere neighboring or adjacent lands, to whom incidental loss accrued, by reason of the lawful establishment and operation of the public improvement. They were left to the common law, which gives no remedy for mere consequential damages, but only in case the injury amounts to a nuisance or taking. The owner of lands of which a part was taken was left in the same class as to his other adjacent land not part of the land out of which a portion was taken. 85 Am. St. Rep., 299, 300, note.

Pursuing the thought from the standpoint of one trying to ascertain how much the residue of the land is lessened in value by the condemnation of a part, is it lawful, as above intimated, to consider the proximity of the improvement itself as a ground of impairment of market value of land? This rule was applied in the *Alloway Case,* supra. There it was held proper to estimate as an element of depreciation in value, the proximity of the reservoir, and the danger of its breaking at some future time, and devastating the rest of the tract, notwithstanding the most careful construction, the danger arising from the nature of such structures, and the impossibility of guarding with absolute security against the constant pressure of a vast body of water.

The same rule obtains in other jurisdictions. *Blesch* v. *Railroad Co.*, 48 Wis., 188, 2 N. W., 113; *Concord R. R. Co.* v. *Greely*, 23 N. H. (3 Foster), 237; *Railroad* v. *Stickney*, 150 Ill., 362, 37 N. E., 1098, 26 L. R. A., 773; *Railroad* v. *Church*, 104 N. C., 531, 10 S. E., 761; *Railroad* v. *Ball*, 5 Ohio St., 575. In fact anything may be taken into consideration which would, in an appreciable degree, capable of ascertainment in dollars and cents, injure the market value of the land so left. *Paducah & Memphis R. R. Co.* v. *Stovall*, 12 Heisk., 1; *Acker* v. *Knoxville*, 117 Tenn., 224, 231, 232, 96 S. W., 973; *Kersey* v. *Schuylkill River East Side R. Co.*, 133 Pa., 234, 19 Atl., 553, 7 L. R. A., 409, and note, 19 Am. St. Rep., 632; 2 Lewis, Em. Dom. (3d Ed.), sec. 748, 710; 4 Sutherland on Damages, sec. 1065; 10 Am. & Eng. Encyc. Law, 1171, 1173; 5 Encyc. of Ev., p. 214; 15 Cyc., 690.

In estimating the extent of lessened value of the land left after appropriating a part, that is the damages so called, it is proper to consider the danger of fire, the annoyance that will probably occur from noise, smoke, cinders, dust, or noisome odors or vapors from engines, and the jarring caused by the passing of trains upon the track over the land taken. *Little Rock, etc., Ry. Co.* v. *Allen*, 41 Ark., 431; *Elizabeth, etc., R. R. Co.* v. *Combs*, 10 Bush. (Ky.), 382, 19 Am. Rep., 67; *Chicago, etc., R. R. Co.* v. *Atterbury*, 156 Ill., 281, 40 N. E., 826; *Matter of New York, etc., R. R. Co.*, 15 Hun (N. Y.), 63; *Comstock* v. *Clearfield, etc., Ry. Co.*, 169 Pa., 582, 32 Atl., 431; *Weyer* v. *Chicago, etc., R. R. Co.*, 68 Wis.,

180, 31 N. W., 710; *Chicago, etc., Ry. Co.* v. *Nix,* 137 Ill., 141, 27 N. E., 81; *Bangor, etc., R. R. Co.* v. *McComb,* 60 Me., 290; *County of Blue Earth* v. *St. Paul, etc., R. R. Co.,* 28 Minn., 503, 11 N. W., 73; *Bowen* v. *Atlantic,. etc., R. R. Co.,* 17 S. C., 574; *Tidewater* v. *Shartzer,* 107 Va., 562, 59 S. E., 407, 17 L. R. A. (N. S.), 1053; *Idaho-Western R. Co.* v. *Columbia Conference,* 20 Idaho, 568, 119 Pac., 60, 38 L. R. A. (N. S.), 497, 507; *Savannah, A. & N. R. Co.* v. *Williams,* 133 Ga., 679, 66 S. E., 942; *Omaha, H. & G. R. Co.* v. *Doney,* 3 Kan. App., 515, 43 Pac., 831; *Danville & I. H. R. Co.* v. *Tidrick,* 137 Ill. App., 553, 557; *Railroad* v. *McAuliff,* 43 Kan., 187, 23 Pac., 102; *Sabin* v. *Railroad,* 25 Vt., 370; *Shano* v. *Bridge Co.,* 189 Pa., 246, 42 Atl., 128, 69 Am. St. Rep., 808. The rule on this subject is well expressed in the following excerpt from Sutherland on Damages, vol. 4, sec. 1065:

"If the land is rendered less valuable because it is exposed to fire, or if access is rendered more difficult, or if the use of the remainder is more inconvenienced by reason of the railroad, or if its value is depreciated by the noise, smoke, or increased dangers caused by such use, all these are to be included in the estimate of damages; not that witnesses are to be called upon to estimate the damages for each or any of them, for though they enter into the estimates, the question is, What is the market value of the land without, and what is the market value of the remainder of the piece with, the railroad? In other words, what is the value of the piece which is taken, and how much is the residue depreciated in its market value by its separation and by

the construction of the railroad? These two sums, add-
ed together, cover the amount of compensation to
which the injured party is entitled.''

Again, in section 1066:

''Where a part has been taken for a railroad it is .
proper to consider all the inconveniences from the
sounding of whistles, ringing of bells, rattling of
trains, jarring of the ground, from smoke, invasion of
privacy, and the deprivation of light, means of access,
and like matters so far as they severally arise from the
use of the strip taken and opened up to use, excluding
all common and indirect damages; that is, such as af-
fect the owner in common with all other members of
the community.''

It is insisted in behalf of the plaintiff that our cases
have already fixed, as the only true criterion of inci-
dental damages, the loss caused by the special physical
consequences resultant from the erection of the rail-
road as distinguished from those caused by its opera-
tion, such as the separation of the land, one part from
the other, by the railroad track, the making of cuts and
fills, the inconvenience of reaching barns and other out-
houses, the impairment of access to roads or streets,
and the like, and that the recognition of impairment to
the market value of the residue of the land not taken,
from other causes, is a distinct departure from pre-
cedent. This is a mistaken view. In several of our
cases the obvious physical inconveniences just referred
to, and others like them, are mentioned as instances,
but in no case are they held exclusive, or held out, or
suggested, as covering the whole field. We have no

case which holds that impairment of market value is not a true criterion. On the contrary we have two in-which it was held that this was a proper matter to consider in estimating the damages. *Paducah & Memphis Railroad Co.* v. *Stovall*, 59 Tenn. (12 Heisk.), 1, 3, 4; *Acker* v. *Knoxville*, supra. In the first of these cases the court approved as unexceptionable, the charge of the trial judge in which he had instructed the jury to consider as an element "the increase or decrease in the price of the remainder of the tract." In the second case the direct point was ruled, in a controversy between an abutting owner and the city of Knoxville, under a statute allowing damages resulting from a change in the grade of streets. As indicated in the last case, the only way in which the open physical inconveniences of the kind we have previously referred to could be made available as elements of damage would be the extent to which they had impaired the market value.

"These incidents," said the court, "would be all such as one would take into consideration in estimating the value of the property, after the grading had been completed. So that the test of the difference between the market value, just before the grading and just afterwards, would be a true one, and would indicate the real injury suffered; the incidents referred to sufficing to direct the attention of the jury to the special elements of the injury and the benefits arising out of the grading, and necessary to be taken into consideration in forming an estimate of the value of the property before and after."

But it was never supposed in these cases, or in any other of our cases, that if other elements impairing market value appeared that these were to be excluded. Indeed, as we have already pointed out, in the case of *Alloway* v. *Nashville,* supra, the damages to be apprehended from the mere propinquity of the erection must be considered in estimating the incidental damages. Further, if, as insisted by the plaintiff, incidental damages can be such only as are caused by the construction of the road, as distinguished from those caused by its operation, why was the rule laid down in *Railroad* v. *Raine,* 114 Tenn., 569, 572, 86 S. W., 857, that such damages should be estimated on the basis that the entire strip taken would be occupied by as many tracks as practicable? There could be no reason for this rule, except that the incidental damages caused by the operation of the road were to be assessed, as well as those caused by its construction. Such damages from operation would be the danger of fire, the noise, smoke, and vibration, which we have already referred to. In *Wray* v. *Railroad,* supra, speaking of incidental damages, the court said (113 Tenn., page 557, 82 S. W., 474) :

They "may consist in the necessity of new fences and walls, the removal of outbuildings, or the danger or inconvenience of getting to them, . . . and many other things" (citing Lewis on Eminent Domain, sec. 496).

In that section of the edition then extant, now section 739 of the third edition, so referred to and approved by this court, the author, after referring to the elements

just mentioned, and others of a similar nature, then proceeds (page 1312):

" 'In an inquiry whether, and how much, the part of a farm not taken for railroad right of way is depreciated in value by the appropriation of a part, evidence as to the size of the farm; the purpose for which it was used; the improvements thereon, and how located; the direction of the road across the farm; the cuts and fills made or to be made in the construction of the road; the width of the right of way; the height of embankments; the depth of ditches; the inconvenience in crossing the track from one part of the farm to another; the liability of stock being killed; the danger from fire from passing trains—are all facts competent for the jury's consideration in determining the depreciation in value of the remainder of the farm' " (citing *Omaha Southern R. R. Co.* v. *Todd,* 39 Neb., 818, 58 N. W., 289). "In the case just referred to it was also said that 'everything which tended to show that the continuing presence and operation of the road across the farm tended to make it more valuable was competent, and everything which tended to show that the continuing presence and operation of the road across the farm depreciated its market value was competent.' Every element arising from the construction and operation of the work or improvement which, in an appreciable degree, is capable of ascertainment in dollars and cents, that enters into the diminution or increase of the value of the particular property, is properly to be tak-

134 Tenn. 21

en into consideration in determining whether there
has been damage and the extent of it.''

So it appears that the doctrine laid down in the present case is by no means a novelty in our State. In the present opinion we have only stated some additional particulars necessarily falling within the rule, and have endeavored to offer certain reasons which seem to us to justify the doctrine as resting in sound principle and substantial justice. We need say no more than we have already said as to the overwhelming weight of authority in other jurisdictions as to the propriety of considering the matter of propinquity and all that it reasonably portends in the way of direct injury to the property, and hence impairment of market value. Indeed we think it would be an impeachment of the fairness of our jurisprudence if the rule were otherwise. It would be nothing less than saying that our courts could, not only within our constitution, but under a true conception of justice, compel one of our citizens to surrender part of his land for, say, the erection of a public pesthouse, and receive no compensation for injury to the market value of the rest of his tract. To exercise such a power would be, not to administer justice, but to inflict oppression. Moreover, it would deny and destroy the very principle by which the courts profess to be guided in conducting such matters—that the landowner should be considered as one willing, but not compelled, to sell, and the condemnor as one willing, but not compelled, to buy. No one can suppose that the landowner would consent to sell a specific part

out of a tract without considering how the taking of
that part would affect the rest of the tract, and with-
out exacting compensation for the lessening of the
market value of the latter thereby. He would do this,
if left free to act, by adding to the price of the part
sold. In condemnation cases he cannot do this, but
must look to the obtention of a separate sum from the
purchaser to cover such incidental damages. Can any
one suppose that if free to contract, he would demand
anything less than the whole damage to the market
value of the land left in his tract? Can any one say his
demand would not be just?

There is nothing in *Vaulx* v. *Railroad,* 120 Tenn., 316,
108 S. W., 1142, *Hord* v. *Railroad,* 122 Tenn., 399, 123
S. W., 637, 135 Am. St. Rep., 878, 19 Ann. Cas., 331, nor
indeed in any of our cases, contrary to what we hold
in the present case.

Having stated the principles which we think control
the controversy, we shall now inquire whether the ob-
jections made to the charge of the court are well taken.

Error is assigned to the following portions of the
charge:

"If there results from the construction and proposed
operation of this railroad any mere, general appre-
hensions, objection or damages entertained by or com-
mon to the entire community through which this rail-
road runs, and which do not directly and proximately
result from the taking of the right of way strip and the
proper construction and proper operation thereon of
this railroad, or which do not directly and especially

affect and reduce the fair, cash market value of the remainder of the property not taken, such things are not to be considered by you at all, but everything necessarily connected with and directly and proximately resulting from the taking of the right of way strip, and the proper and careful construction and operation of this railroad, which has the effect of directly and especially reducing or pecuniarily damaging the fair cash market value of the remainder of the land taken, are to be considered by you in awarding incidental damages to the remainder of the land not taken; and the mere fact that other pieces of land lying in similar proximity to the railroad, and no part of which is taken, suffer similar damages to that especially resulting as aforesaid to the remainder of the tract of land in question constitute no reason or excuse why you must not award such incidental damages to the remainder of this tract of land not actually taken.''

Also to the following portion of the charge:

''Incidental damages are damages to the land not taken, as distinguished from compensation for the land that is taken. The incidental damages to the remainder of the land not taken, which you will award in this case, are such pecuniary damages to or reduction of its fair cash market value as naturally, directly, and proximately result from and are produced by the actual taking of the strip of land one-hundred feet wide, containing two and thirty-one one-hundredths acres, and by the construction and operation of the railroad thereon, assuming that it will not be either constructed or oper-

ated negligently or carelessly, but will be both con-
structed and operated with ordinary care; that is, such
care as would be expected of one of ordinary prudence
under all the then existing and surrounding circum-
stances.''

Likewise the following:

''And, further, as to the incidental damages you will
award with reference to the remainder of the tract of
land not taken, I charge you that you are allowed, and
that you should take into consideration in estimating
these incidental damages, any necessary danger and
peril from sparks or fire incident to the careful opera-
tion of trains while on said strip, and necessary noise,
smoke, soot, cinders, escaping fumes and gases and
vibration, which, though the road be constructed and
operated with ordinary care over the right of way
strip, necessarily, directly, and proximately affect un-
favorably the fair cash market value of the remainder
of the land not taken. And with reference to this I
charge you that, if the preponderance of all the evi-
dence shows you that such things must necessarily re-
sult, even though the railroad be constructed and oper-
ated with ordinary care over the strip of land taken,
which you must assume, and if the preponderance of all
the evidence also shows to you that these things will
directly and proximately depress the fair cash market
value of the remainder of the tract not taken, then you
must take into consideration the necessary danger and
peril from sparks or fire from trains while on said strip
and the necessary noise, smoke, soot, cinders, escaping

fumes, gases, and vibrations so resulting, as well as inconvenience to ingress and egress from one part of the remainder of the land not taken to another part of the land not taken.''

It is perceived that the foregoing instructions are in full accord with the principles we have previously stated. The assignments making objections to the foregoing parts of the charge must therefore be overruled.

There are likewise numerous other assignments, based on the refusal of the trial judge to charge certain instructions offered by the plaintiff, stating principles the reverse of those contained in the charge of the court which we have approved; also still other numerous assignments, all arising on the action of the trial judge in refusing to strike out certain of defendants' evidence and his refusal to permit the introduction of certain evidence by the plaintiff, all of which are founded on theories diametrically opposed to the principles which we have just held should control the controversy. These assignments must also be overruled. These several assignments, together with those on the sections of the charge we have quoted, are numbered from 1 to 14, inclusive.

Sufficient has already been said, perhaps, to fully indicate what, in our view, is to be understood by the term ''special damages;'' but there is much discussion in the briefs of counsel as to what shall be excluded under the term ''general damages.'' It is manifestly impossible to define the term so as to cover all possible

cases. It may be defined, as was done by the learned trial judge, in one of the excerpts quoted supra, as:

"Damages common to the entire community through which the railroad runs, and which do not directly and proximately result from the taking of the right of way strip, and the proper construction and proper operation thereon of the railroad."

The two terms are drawn from the law of nuisance; the term "general damages" corresponding with the term "public" or "common nuisance," and the term "special damages" corresponding with the term "private nuisance;" for the former, when the injury is only to the public in general, there can be no private action, while for the latter there may be, but a public or common nuisance may be at the same time a private nuisance, when it inflicts a special injury upon the property of some individual, different from that inflicted on the public at large, and such special injury occurs when the nuisance impairs the value of such property in an appreciable degree that can be measured in dollars and cents. *Wylie* v. *Elwood,* 134 Ill., 281, 25 N. E., 570, 9 L. R. A., 726, 23 Am. St. Rep., 673.

"The use of a steam engine in a crowded street may be a public nuisance, but, in a case where the smoke from it also injured the goods in a man's shop and made his dwelling uncomfortable, it was held to be such a private nuisance as would give him a right of action. Wood, Nuisance, sec. 649. In *Francis* v. *Schoellkopf,* 53 N. Y., 152, it was held that, although the stench from a tannery injured a large number of

houses, yet the plaintiff, whose dwelling was made uncomfortable and almost uninhabitable was entitled to sue for her particular injury." Id.

In *Aldrich* v. *Wetmore,* 152 Minn., 164, 171, 172, 53 N. W., 1072, 1074, it is said:

"Again, take the case of an obstruction of a street. Those who are injured merely because they are prevented from traveling that street could not maintain private actions, for it is only a public right, enjoyed in common with people generally, which has been interfered with; but those whose property or business in the immediate vicinity is impaired in value or destroyed, by reason of the interruption of convenient access to the premises, may have their actions, because it is their private property rights that have been interfered with. It is not the number who suffer, but the nature of the right affected, which determines whether an action will lie. If the nuisance merely affects the rights enjoyed by citizens as a part of the public. as for example, the right to travel a public highway, the only redress is by proceedings in the name of the State, although only one man has been actually prejudiced. If, on the other hand, the right interfered with is a private one, as where one suffers damage in person or estate by reason of the nuisance, an action will lie, whether the number of those who have suffered is one or one hundred."

To the same effect, see *Chicago* v. *Burcky,* 158 Ill., 103, 42 N. E., 178, 29 L. R. A., 568, 49 Am. St. Rep., 142; *Miller* v. *Schenck,* 78 Iowa, 372-375, 43 N. W., 225;

*Sheedy* v. *Union Press Brickworks,* 25 Mo. App., 527;
*Thomas* v. *Intercounty St. Ry.,* 167 Pa., 120, 125-126, 31
Atl., 476; *Flynn* v. *Taylor,* 127 N. Y., 596, 28 N. E., 418,
14 L. R. A., 556.

Still illustrating by street cases, it was said in *Re
Melon Street,* 182 Pa., 397, 38 Atl., 482, 38 L. R. A., 275,
referring to a claim for damages under a Pennsylvania
statute concerning the vacation of streets:

"For the loss or inconvenience caused by the vaca-
tion of a street, which those who own properties abut-
ting thereon share in common with the community at
large, there can be no recovery. Where their loss does
not differ in kind from that sustained by all others
who have occasion to use the street for the purpose of
travel, it is *damnum absque injuria.* But the owners
of properties which have depreciated in value by rea-
son of the closing of the street have sustained an in-
jury in their property rights which is peculiar to them-
selves, and which is different in kind from the injury
sustained by those who use the street for travel only.
. . . It is an additional injury, caused by the impair-
ment of an entirely distinct right, the special right of
ingress and egress. The interest of the public in a
highway consists wholly in the right of passage with
the incidental right to do all acts necessary to keep it
in repair; the owner of land fronting on a highway has
an additional interest which must be regarded as prop-
erty and which, when the right to recover has been giv-
en by the State, will sustain a claim for compensation."

So, in *Pennsylvania R. R. Co.'s Appeal,* 115 Pa., 514, 529, 5 Atl., 872, 877:

"All persons who merely travel on Brown street suffer the same kind of inconvenience or injury, though the suffering may differ in degree. But he who has his dwelling fronting on the street, who cannot turn his carriage between the front of his lot and the rails, who must drive around a block because he cannot turn in the street, whose business as a physician is interfered with, or who is subject to the smoke, noise, and other incidents of railway trains passing near his door, suffers a special injury which differs in kind as well as degree from that done to the mere traveler."

In *Bangor & P. R. R. Co.* v. *McComb,* 60 Me., 290, 297, after discussing the right to recover for damages done to the remaining part of the land left after taking a portion of the whole tract, the court said:

"There must be, however, a limit, which will exclude remote, indefinite, or possible damages. The damages must be direct, not such as are general or common to others or to the whole community. They must be such as it may be fairly anticipated will result from the taking of the land, in the form, direction, and use of the track or road taken to the remaining part, and to the erections thereon."

"Although it might be difficult to exclude from the enlarged idea of a 'just compensation' some of those damages which are termed 'indirect,' yet the difficulty of estimating them, and the almost unlimited range

which such a discussion must take, and the impossibility of justly giving damages for such indirect, remote, or general injuries, when one man's land is taken, and refusing them to his neighbor, who may be an equal sufferer in fact, from the proximity of his premises, no part of which is taken for the road, have led to the conclusion that the only practicable rule is to confine the award to the direct injuries to the lot in question. . . . The corporation requested the instruction that the jury 'are not authorized to assess any damages for all inconvenience arising from the sounding of whistles, the ringing of bells, the rattling of trains, the jarring of the ground, and for smoke, which are common to all the inhabitants and proprietors along the line of the railroad.' The presiding officer instructed the jury that the inconveniences named in the request, to constitute elements of damage in this case, must be the result of the location of the road over the premises in question. That the whistling, ringing of bells, and other matters named, at a distance, and which constituted a common annoyance were not to be considered. We understand that the fair meaning of this instruction is that these matters off of the premises in question, at any distance therefrom, must be excluded from consideration. But the jury might consider them, when arising from the use of the land taken, and on that land. No one can seriously question that many, if not all, the matters specified in the request may be specially annoying to the owner in the use of his property. The track may be so near his house that smoke may enter

it every time the engine passes. His house may be at the exact distance from a crossing, which the law designates as the place where the whistle shall be sounded with its shrill cry. If the jury might properly consider the use to be made of the land, then all the natural, usual, and lawful results from that use may be considered, when restricted to the lot itself. A common nuisance, which annoys the whole neighborhood, may also be a private and special nuisance to an individual, beyond, that endured by the public. We see no ground to except to this instruction, qualified as it was in the giving, and also qualified by a reference to the former part of the charge, by which all common and indirect damages were excluded.''

To the same effect see *Walker* v. *Old Colony & Newport Ry. Co.*, 103 Mass., 10, 14, 15, 4 Am. Rep., 509.

''The damage must be a damage to property, and not a mere personal inconvenience or injury. . . . If a right of action is merely personal, without reference to property, the constitution does not guarantee compensation. If the injury amounts only to an inconvenience or discomfort to the occupants of property, which would authorize a personal action, but not affecting the value of the property, it is not within the provision. . . . The special damage must be different in kind from that sustained by the general public, although it does not cease to be special because a considerable number are affected in the same way. . . . The general public does not mean the people of the State at large or of some other town or city who are not affected

at all by the improvement, but it means the people of the whole neighborhood, and if the damages differ only in degree from those suffered in common by such public, the injury is not within the provisions of the constitution. It is a matter of common knowledge that where bituminous coal is used by individuals, manufacturing establishments, and railroads, the atmosphere is filled with smoke and more or less soot is deposited over the whole neighborhood or city. In populous communities no one escapes injury and annoyance from other causes, such as the dust raised in dry weather by teams, and the noise of travel over stone pavements, and perhaps with loads which add greatly to the noise. Such things are inconveniences, but they are common to everybody and special to none. They affect every one who comes within their range, without regard to ownership of property. If it were not required that damages should be special to property, there would be no stopping place in litigation, and the number of infinitesimal injuries for which action could be brought would be unlimited." *I. C. R. R. Co.* v. *Trustees of Schools*, 212 Ill., 406, 413, 72 N. E., 39, 42.

It is perceived from the description which has been given of the term "general damages," the latter has no application to and does not tend to relieve the apparent inequality arising out of the fact that where a part of an owner's land has been taken in condemnation proceedings, consequential damages are allowed him for the injury or loss of market value inflicted upon the residue of the tract not taken, and that such damages

Railroad v. Hinds.

are not allowed in the case of adjacent owners, no part of whose land is taken, although they suffer much to the same extent. This point was considered in the case of *Blesch* v. *Chicago & Northwestern Ry. Co.,* 48 Wis., 168, 188-191, 2 N. W., 113. In that case it was said that the statutes regulating the exercise of the right of eminent domain impose, as a condition of the taking of the land of any owner, that he shall be paid damages to the extent that the residue of his tract shall be injured, while the right of an adjacent owner, no part of whose land is taken, is regulated by the common law, which grants no recovery for mere consequential damages attendant upon the operation of a public improvement authorized by law. Continuing, the court said:

"It may be said that the law is unequal and unjust which allows the person whose lands are taken, not only the value of his lands, but his damages resulting from the use of the lands so taken, for railroad purposes, and makes no provision for making any compensation to the adjacent owner whose lands are not taken, but suffers in the same degree as his neighbor from the operation of the road. There may be some force in this argument when addressed to the legislature, but it can have but little force when addressed to the court, whose duty it is, not to make the laws, but to administer them as made."

At another place in the opinion it is said:

"The fact that a man whose land is not taken cannot recover any consequential damages which he may sustain by reason of the building and operating the road

near his land does not prove that the party whose land is so taken cannot recover damages of a like nature. The right of the latter depends upon the constitution and the statute giving him the right to recover damages, and the right of the former depends upon the principles of the common law, the statute being entirely silent upon the subject.''

The foregoing observations are equally applicable under our own constitution and statutes. It is clear, therefore, that the consequential damages suffered by mere adjacent owners, no part of whose land had been taken, did not fall within the term ''general damages,'' to be excluded in estimating the damages to which the defendants were entitled in the present case.

The supposed injustice arising from this state of the law as noted in *Richards* v. *Washington Terminal Co.,* supra, wrought as the motive which prompted the amending of the constitutions of certain States there mentioned, and in changing the statute laws of England, as fully shown by Lewis in section 346 and succeeding sections. But the distinction is easily comprehensible on the grounds set forth in the case last quoted, and in other cases from which excerpts have been made. It becomes, or seems to us, the more tolerable, too, when it is considered that condemnation proceedings, as we have already ventured to hold, should be treated as resting fundamentally on the basis of contract, while the rights of mere adjacent owners find protection, as to the injuries complained of, only under

the law of tort.   It is true a man may suffer as much loss through the means of an improvident contract, made by himself with another, or by a court for him, as through an injury inflicted upon him by the tort of another, but it is beyond doubt that through the liberty of contract he may protect himself from many inconveniences against which the law could not otherwise afford him any redress; relief which neither he nor another could claim under the law governing cases of tort.

Assignments Nos. 15, 16, and 17 raise points of evidence similar in character.                              ,

No. 15 is based on the action of the trial judge in declining to permit the witness W. L. Horne to state, in the presence of the jury, that one of the owners of a percentage of the beneficial interest in the property in question had stated to him, in the month of November, 1909, that the land could be bought for $30,000.

Assignment No. 16 is based on the action of the trial judge in declining to permit the railroad company to show, on cross-examination of W. S. Ashworth, one of the defendants, the price paid by the city of Nashville for the one-hundred and fifty-one acres known as Shelby Park on October 12, 1909.

Assignment No. 17 is based on his action in declining to permit the plaintiff to show, upon the cross-examination of Dr. R. E. Fort, a witness for the defendant, the price for which he purchased a neighboring tract of land, containing three-hundred and sixty-eight acres, on January 17, 1910.

The trial judge, in ruling out the first item of evidence, stated that he did so because it was too remote in point of time—

"Especially in view of the special circumstances and changes that have been developed in this case by this witness."

In ruling out the second item, he said:

"Believing it has been proved in this case that in 1909 there was an extreme depression in real estate—I think the witness Horne stated that—and in view of the fact that it was two years prior to this, and in view of the fact that it has been proved by a number of witnesses that the very fact that the park was to be established, and was going to be improved at public expense, and was being improved from the time of the purchase up to the time of this condemnation, makes the proof of the sale of the park itself, not only not helpful, but actually misleading; therefore I exclude it."

In ruling out the third item of evidence the trial judge said:

"I don't think the price at which Dr. Fort bought this land is competent, for several reasons: First, he bought it in January, 1910, and the park was purchased in October, 1909, and the evidence is that no work had been done on it. Winter came on right after the purchase, and it was not working time of the year. Most of the work in laying out and improving the road was done during the year 1910 and during 1911. Prior to November, 1911, the date of the condemnation, the

boulevard wasn't yet mapped or projected, nor survey-ed, and no rights of way obtained, and of course no work done.

"That the bad effects of the panic of 1907, which the court knows commenced in about October 1907—I suppose it is part of the history of the country I may take judicial knowledge and notice of—and that the effect of that had not yet passed away, money was still tight, land values were depressed, and although another wit-ness, Mr. Horne, mentioned, and that I believe on reflection he mentioned in the absence of the jury, still it is before me, and I suppose I may notice it, and Dr. Fort's testimony corresponds with Mr. Horne's, a professional expert real estate man introduced by the plaintiff. Those three things differentiate that sale so much from the condition of things in 1911, at the date of the condemnation in November, 1911, as regards this Ashworth tract, that I do not think it will throw any light upon the matter that would aid the jury. On the contrary, it would probably mislead them. Then, in addition to that, two-hundred and seventy-five acres of Dr. Fort's tract is wholly different land from this. In other words, much the greater part of it, because he states that it overflows whenever there is high water, or parts of it overflow, which leaves islands above in the high water, unfitting it for building purposes, and fitting it only for agricultural and possibly some fac-tory sites. The nature of the land, and the nature of the circumstances, is such I don't think it ought to go

before the jury, for it will probably mislead them rather than aid them.''

The foregoing are the reasons given by the learned trial judge as those governing him in the exercise of his discretion in ruling upon the points of evidence mentioned, and they were approved by the learned court of civil appeals, when the case was heard in that tribunal.

In addition to the foregoing, we may add a few more particulars in respect of the subjects mentioned, at the risk of repeating in part some of the observations contained in the statements of the trial judge.

As said, the alleged offer of sale by one of the owners of the tract in controversy, or rather his statement that he would be willing to take $30,000 for it, was made when the market was dead, and before any improvements had been made upon Shelby Park, and before the boulevard had been projected along the side of this tract. At the time the land was condemned two years later, Shelby Park, which covers the entire front of the land in controversy, had been beautified, and the boulevard had been projected to run one thousand feet along another side of this tract, and had been completed up to its margin. The evidence is that the beautification of the park, and the establishment of the boulevard, very greatly enhanced the value of this land. So, taking into consideration the lapse of time and the difference in the two states of the market, and the surroundings of the land as compared with the situation in October, 1909, we do not think the trial judge wrong-

ly exercised his discretion in declining to permit the introduction of the evidence of the alleged offer made in October, 1909.

As to the refusal of the trial judge to permit evidence as to the purchase price of the park on October 12, 1909. In addition to the difference in time between October 12, 1909, and November, 1911, when the land in controversy was condemned, it should be borne in mind that when this sale occurred there was no park in that vicinity at all, and it was this sale which made Shelby Park a possibility; and, furthermore, it was the beautification and development of this park, and the establishment of the boulevard, which had given greatly increased value to the property in question between the date of this sale and the date of the condemnation on November 25, 1911. We do not think that the price paid for a park, at the time the land comprising it was bought, is proper evidence to be introduced thereafter upon the issue of the market value of a neighboring piece of property, the increased value of which was caused by the establishment of such park. At least we cannot say that the trial judge wrongly exercised his discretion in excluding such evidence under the circumstances stated. We should add, furthermore, in respect of the difference between the park land and the land in controversy, that the former suffered over a considerable part of its area from backwater at that time, while the latter is but little affected in this regard, if at all.

In respect of the Fort land, in addition to the items of fact mentioned by the trial judge, it should be remembered that when this land was purchased by Dr. Fort it was much less easy of access from the city of Nashville than after the opening of the park and the establishment of the boulevard. The latter roadway, not only added a distinct beauty to all of the lands near which it ran, but opened to them a much nearer and more direct way to the city. Before the opening of that boulevard the route from Nashville to Dr. Fort's place was somewhat circuitous, and was for a considerable part of the way over a narrow country road. Furthermore, the history of that tract of land in respect of its final sale to Dr. Fort is not unimportant in its bearing upon the special question now before us. While it was not, strictly speaking, a forced sale, yet it does appear that Cooper and wife, who had previously bought the land from one Littleton, after having paid for it one-fourth in cash and the balance on time, had failed to make two payments; had suffered the filing of a bill against them to foreclose the lien; had effected a compromise through which they had reconveyed the land to Littleton, taking back an option to buy within two years thereafter; had sold their option to one Cornish; had found that the latter was unable to make his payments in execution of the option; and had been compelled to retake the latter, and it appears that they had but little means. So it appears that unless they could sell their option to another, they would lose everything they had paid into the land. It is no small matter to

sell three hundred and sixty-eight acres of land, and although when they sold to Fort they had about two years still in which to effect the sale, it cannot be said that, considering the previous history of the transaction, Cooper and wife were in a position to stand out against the offer made to them by Fort.

Now the question is whether, in view of all the circumstances, the trial judge properly exercised his discretion in refusing to permit proof of the Fort transaction. We cannot say that this discretion was improperly exercised.

Moreover, in any case of the kind, we should hesitate to reverse where there was a concurrence between the trial judge and the court of civil appeals.

On the general question of the admission of evidence of other sales this court has held, in *Union Railway Co.* v. *Hunton,* 114 Tenn. (6 Cates.), 609, 88 S. W., 182, that such evidence is competent, quoting with approval the following passage from Lewis on Em. Dom.:

"The propriety of allowing proof of sales of similar property to that in question, made at or about the time of the taking, is almost universally approved by the authorities."

In that case we did not undertake to go into the limitations of the doctrine, because the question was simply whether such evidence was competent at all, the trial judge, in that case, having ruled out all questions on the subject without hearing the testimony of the witnesses; that is, had ruled out the whole line of

evidence without respect to the peculiarities of any item of such evidence.

"In regard to the degree of similarity which must exist between the property concerning which such proof is offered and the property taken and the nearness in respect of time and distance, no general rules can be laid down. These are matters," says Mr. Lewis, in his great work on Eminent Domain, "with which the trial judge is usually conversant, and they must rest largely in his discretion." Section 662 (3d Ed.), pp. 1139, 1140.

The learned author cites in support of his proposition *St. L., etc., Ry. Co.* v. *Guswelle,* 236 Ill., 214, 86 N. E., 230; *Chandler* v. *Jamaica Pond Acqueduct Co.,* 122 Mass., 305; *Amory* v. *Melrose,* 162 Mass., 556, 39 N. E., 276. These authorities fully sustain the text, and there are numerous others to the same purport.

There is quite a line of Massachusetts cases besides those mentioned, but most of them are referred to in one or the other of the cases which we have cited. Authorities from other States that may be referred to are *Watson et al.* v. *Mil. & Mont. R. R. Co.,* 57 Wis., 350, 15 N. W., 468; *Stinson* v. *Chicago, St. P. & M. Ry. Co.,* 27 Minn., 284, 6 N. W., 784; *Seattle & Montana Ry. Co.* v. *Gilchrist,* 4 Wash., 509, 30 Pac., 738; but, as well said in the Washington case just referred to, the discretion of the trial judge is not unlimited in such matters, but will, in proper cases, be reviewed by the appellate court.

The eighteenth assignment is based upon the following facts: Upon the coming in of the report of the jury of view in November, 1911, plaintiff railroad company excepted to the report; the exception was overruled; it appealed, and thereupon obtained an order permitting it to take possession on giving bond in double the amount of the award; and the defendants excepted to the report of the jury of view because the amount awarded was inadequate; the exceptions were overruled, and they thereupon prayed and obtained an appeal. The appeal was prayed and granted in the name of all of the defendants on condition that they should make and file with the clerk an appeal bond for costs, as required by law.

When the case was taken up for trial at the February term, 1914, counsel for both parties stipulated orally that the only question then in the case was the value of the land taken and the amount of the damages. The case was taken up for trial on the 23d day of March, 1914, and occupied the time of the court from that date to April 21, 1914, and no less than fifty witnesses were examined and cross-examined at great length, making the record over two thousand pages. Finally, when the testimony was closed and the case had been fully argued before the jury by counsel for both parties, and the judge was about to deliver his charge to the jury, the plaintiff railroad company, by one of its attorneys, moved to dismiss the appeal of the defendants because not in accordance with the law, or with the order of the

court, and further moved that the award and finding of the jury of view be affirmed.

During the discussion that ensued it was developed that the appeal bond had been made out by one of the attorneys for the defendants, who had signed the names of Ashworth, Hinds, and Long, omitting the names of two of the defendants, Halbert and Miss Dickinson, but the bond was signed by sureties.

In reply to a question by the court, one of the counsel for the plaintiff railroad company stated that he had discovered the defect in the appeal bond about two weeks prior to that time. A counter motion was made by the defendants to be permitted to insert the names of Miss Dickinson and W. H. Halbert; also for the filing of another bond with the names of all, and the designation of Hinds, both as trustee and individually, it appearing that he had an individual interest in the property, and also that the legal title was in him as trustee for the other owners.

The motion was granted. To this action of the court the plaintiffs excepted.

The objection to the bond was not made until two weeks after its discovery, and, furthermore, was not discovered or made until many terms of the court had elapsed, and until after the trial had been completed, and two weeks had passed with the knowledge in possession of the plaintiff. Under these circumstances we think that the motion came too late, and that it was properly overruled on that ground. *Gillespie* v. *Goddard,* 1 Heisk., 777; *Tedder* v. *Odom,* 2 Heisk., 50;

*Staub* v. *Williams,* 2 Leg. Rep., 183; *Snyder* v. *Summers,* 1 Lea, 481. In addition, we are of the opinion that the trial judge properly exercised his discretion in permitting the appeal bond to be amended. *Morris* v. *Smith,* 11 Humph., 135; *Adamson* v. *Hurt,* 3 Shan. Cas., 424; *Staub* v. *Williams,* 1 Lea, 36; *Wilson* v. *Corry,* 1 Lea, 391; *La Follette* v. *Road Commissioners,* 105 Tenn., 536, 58 S. W., 1065; *Jones* v. *Ducktown, etc., Co.,* 109 Tenn., 375, 71 S. W., 821.

This assignment must therefore be overruled.

The nineteenth assignment is peculiar, in that it complains in general terms that:

"The court of civil appeals erred in not adjudging and holding that the plaintiff in error had not received what under the law is recognized as a fair trial."

It then specifies several instances of alleged unfairness.

The first of these is the permitting defendants to ask, in cross-examination, the witness Peay certain questions. The substance of the matter may be thus stated: Peay had said in his original examination that he believed there would be some benefits to the defendants because the land could be used for factory sites. In order to rebut this the defendants undertook to prove by him that the Lewisburg & Northern Railroad Company was a departmental line, belonging to the Louisville & Nashville Railroad Company, for the purpose of transporting its fast through freights around Nashville without entering the Nashville terminals, the inference being from this that there would be no stops

on this land. He testified that he had this matter in mind in delivering his evidence. Counsel for the defendants stated that they desired the evidence only with a view to the question of incidental benefits. The counsel for the plaintiff objected because it was irrelevant, and a matter about which the witness could have no personal knowledge; hence that it must be a matter of mere hearsay. The evidence was perhaps competent as a means of testing what was in the mind of the witness at the time he stated his estimate of the damages. But whether competent or not, it could have done the plaintiff no harm, as it is not contended that there were any incidental benefits, nor was there any controversy to the effect that the Lewisburg & Northern did not have the right to condemn the property. So, if there was any error, it was wholly innocuous.

The next specification is the action of the trial court in permitting W. S. Ashworth, one of the owners, to give his reasons why the owners of the land had held it for twenty-five years without any effort to put it on the market. His answer, in substance, was that the prospects were so flattering to an increase in the value of the property, and so many improvements were going on in the neighborhood in the way of parks and boulevards that the owners were holding it to get the advanced price, or what these things would add to it. We think this testimony was relevant for the purpose of meeting the inference to be drawn from the otherwise

unexplained fact that the land had been held from the market for so long a time.

The next specification is that:

"The court permitted counsel for defendant land-owners to cross-examine the witness C. C. Strong, and require him to detail what had been done with a tract of land near Birmingham. He was further allowed to tell how the tract involved in this case could be modeled, platted, surveyed, and outlined for residence seekers," etc.

This specification is insufficient under rule 14, subd., 3, 126 Tenn., 722, 160 S. W., ix. The rule reads:

"When the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence, admitted or rejected, with citation of the record where the evidence and ruling may be found."

A subspecification under the one just mentioned is subject to the same objection. This specification is that:

"The court permitted counsel for the defendant to assume that the witness was arguing the case with him, and was evincing partiality in his testimony. The court stated that such questions were proper."

This does not state the substance of the questions, but only the conclusions of counsel as to their effect. As to the first part of the specification, we deem it only necessary to remark that, even if properly assigned, it could be of no moment, because the evidence complained of was in response to similar evidence intro-

duced on the original examination of the witness Strong, concerning the impossibility of making proper streets over the land for the purpose of subdivision. The cross-examination as to the Birmingham lots was by way of illustration for the purpose of showing how streets might, with good results, be curved so as to fit the lay of the land.

The next specification is that:

"The court allowed W. S. Ashworth, one of the defendants in error, to testify that the fact that the buildings adjacent to Shelby Park were of an inferior kind would not in any way detract from the value and desirability of the property in question, nor would it prohibit Shelby Park from contributing to the property in question as a place for desirable and high-class residences."

No statement of the objections made to this evidence appears in the assignment, and no reason is given showing a *prima facie* case of error, as required by rule 12, 126 Tenn., 720, 160 S. W., viii.

The next specification refers to a matter which was withdrawn by the trial judge, so it need not be further mentioned.

The next specification is:

"The trial court permitted counsel for the property owners to interrogate the witness Frank Butler about the connection of Maj. E. C. Lewis with the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company. This was objected to on the ground that it was not in any way

relevant, pertinent, or competent. The court stated in the presence of the jury that he permitted it on the ground that it shows rather a lack of diligence on the part of the railroad in not finding the witness sooner. The witness was also asked about his relationship with Maj. Lewis, and permitted to show that Maj. Lewis was connected with the railroads above mentioned.''

We do not think there is anything in this point. The way the controversy arose over this particular matter was that the witness Butler was offered in rebuttal by the plaintiff, and his testimony objected to by the defendants. . Their effort was to show that the plaintiff had not been diligent in the production of this witness. It already appeared in the evidence that Maj. Lewis was connected with the plaintiff, and had been employed in securing rights of way for it. It was also shown that Mr. Butler had married his niece, that he was superintendent of parks, and that Maj. Lewis was also interested in the parks, that Mr. Butler knew the attorneys for the plaintiffs, and so the purpose was to show that the plaintiff either knew, or ought to have known, what the witness would testify, and that therefore there was no ground for introducing him after the plaintiff had closed its case. However, the trial judge admitted the evidence. What was proven in regard to the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company was for the purpose of connecting Maj. Lewis, as an official of the three railroads, with the particular enterprise then under examination. While it is not very

apparent why his connection with the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company could throw any light upon the particular transaction, in the absence of competent proof as to the interest of these two roads in the third road, still this evidence could not have been hurtful to the plaintiff. It was only introduced for the purpose of laying grounds for error on the part of the defendants in case there should be an unfavorable result in the trial court.

When the whole matter is thus understood, we think no prejudice accrued to the plaintiff on account of this testimony.

The next and last specification under this head is:

"That during the cross-examination of the witness J. N. Kirtland on how he arrived at the conclusion that the incidental damages to the property amounted to a certain per cent., testified to by him, the court, in declining to permit further cross-examination of the witness, stated that he thought the witness had given a reasonable answer to the questions put to him, and that he did not see how the witness could have answered these questions in any other way."

We do not think this specification is sufficiently assigned under the sections of the rules which we have previously quoted. However, aside from this, we do not think that, when the matter is understood as the record discloses, there was anything hurtful in the remark which the trial judge made, although we are of the opinion that he should not have made such an ob-

servation. The way the matter arose was this: The witness had stated that he estimated the damages at sixty-five per cent. of the value he had placed upon the land, which resulted in $29,250, according to his estimate of value and the percentage stated. The witness was then pressed through a series of questions by counsel for the plaintiff as to why he had selected sixty-five per cent. as against sixty-two per cent. or sixty-two and one-half per cent., and so on. His answer, repeated in various forms, was that sixty-five cent, was what he thought the damages were. After the witness had been thus pressed in the cross-examination, the trial judge stated that he thought the cross-examination had gone far enough, and said:

"The witness has answered it a number of times; that was his estimate. I don't see how he can answer it any other way. I think he has given you a reasonable answer to your question, and it is not necessary to pursue it any further."

We think that no prejudice could have resulted from this language of the trial judge. Of course, it was within his discretion to check the cross-examination when he became satisfied it had gone sufficiently far, and we are unable to see that he abused that discretion.

The remaining assignments relate to the amount of the damages. It is insisted that the verdict was excessive. This question has given the court much concern, and we have anxiously considered it. It has been the occasion of diverse views, and much discussion between the members of the court. The general impres-

sion received from the oral argument at the bar was that it was too high, and after a long and very patient examination of the record, we have discovered nothing to change that view, but much to strengthen it. The learned court of civil appeals, while formally concurring with the trial court and approving its action, expressed its sense of the disproportionate character of the amount allowed, but felt compelled to let it stand because there was evidence to support it. We have weighed this evidence. The description of the land is full, likewise the portrayal of its situation and surroundings and the views of witnesses as to its capabilities. There is really but little material conflict in the evidence on these facts. But when we come to an examination of the testimony of the witnesses, as to the amount of damages, there is an astonishing contrariety of opinion, not only as between the witnesses of the plaintiff and those of the defendants, but between these witnesses on each side as between themselves. It would be a useless consumption of space to set out these contradictions in this opinion. The amounts are tabulated in the very able brief of the defendants' counsel, and have had our full consideration. It suffices to say that, in the nature of the case, these witnesses were, in a sense, guessing. Perhaps we should not say "guessing;" but, at all events, they could do no more than hazard their opinions as to the probable effect of the railroad on the market value of the land after taking out the right of way. Such evidence is the best that

the nature of the case affords, but we cannot but feel that it is essentially uncertain, and not very reliable. Therefore, viewing the case as a whole, we believe that justice requires some reduction in the amount of the incidental damages allowed. We suggest a remittitur of $10,000. If that be accepted by defendants within a week from this day, the residue of the judgment will be affirmed; otherwise the judgment will be reversed, and the cause remanded for a new trial.

BUCHANAN, J. (dissenting).

From time to time for more than sixty years the subject of incidental damages in condemnation cases has occupied the attention of the able judges and distinguished lawyers whose labors are part of the judicial history of Tennessee. During that time there has been no provision in the constitution of this State dealing with the subject of incidental damages. The leading case (*Woodfolk* v. *N. & C. R. R. Co.*, 32 Tenn. [2 Swan], 422) calls attention to this fact, in respect of the constitution in force then, and no change has since been made. During all this time such right as now exists in a landowner to recover incidental damages in condemnation cases has been regulated by legislation, and by judicial construction of such legislation. The cases construing our legislation, and touching the right directly and remotely, are cited in *Vaulx* v. *Railroad*, 120 Tenn. (12 Cates), 316, 108 S. W., 1142. See, also, the later case of *Hord* v. *Railroad*, 122 Tenn. (14 Cates), 399, 123 S. W., 637, 135 Am. St. Rep., 878, 19

Ann. Cas., 331.  In each of these cases the opinion was by the present chief justice of this court.

To the point made by condemnors in the present case that in none of the former adjudications in this State was there to be found a holding that "sparks, fire, noise, smoke, soot, cinders, escaping fumes, gases, and vibration, caused by the operation of a railroad," were to be regarded as incidents of the taking and elements to be considered in ascertaining damages incidental to the taking, the majority opinion responds as follows:

"It is insisted in behalf of the plaintiff that our cases have already fixed, as the only true criterion of incidental damages, the loss caused by the special physical consequences resultant from the erection of the railroad as distinguished from those caused by its operation, such as the separation of the land, one part from the other, by the railroad track, the making of cuts and fills, the inconvenience of reaching barns and other outhouses, the impairment of access to roads or streets, and the like, and that the recognition of impairment to the market value of the residue of the land not taken, from other causes, is a distinct departure from precedent.  This is a mistaken view.  In several of our cases the obvious physical inconveniences just referred to, and others like them, are mentioned as instances, but in no case are they held exclusive, or held out, or suggested, as covering the whole field.  We have no case which holds that impairment of market value is not a true criterion.  On the contrary, we have two in which it was held that this was a proper matter to consider in

estimating the damages. *Paducah & Memphis Rail-*
*road Co.* v. *Stovall,* 59 Tenn. (12 Heisk.), 1, 3, 4; *Acker*
v. *Knoxville,* supra. In the first of these cases the
court approved, as unexceptionable, the charge of the
trial judge in which he had instructed the jury to con-
sider as an element 'the increase or decrease in the price
of the remainder of the tract.' In the second case the
direct point was ruled, in a controversy between an
abutting owner and the city of Knoxville, under a stat-
ute allowing damages resulting from a change in the
grade of streets. As indicated in the last case, the only
way in which the open physical inconveniences of the
kind we have previously referred to could be made avail-
able as elements of damage would be the extent to
which they had impaired the market value. 'These in-
cidents,' said the court, 'would be all such as one would
take into consideration in estimating the value of the
property, after the grading had been completed. So
that the test of the difference between the market val-
ue, just before the grading and just afterwards, would
be a true one, and would indicate the real injury suffer-
ed; the incidents referred to sufficing to direct the at-
tention of the jury to the special elements of the injury
and the benefits arising out of the grading, and neces-
sary to be taken into consideration in forming an es-
timate of the value of the property before and after.'
But it was never supposed in these cases, or in any
other of our cases, that if other elements impairing
market value appeared that these were to be excluded.
Indeed, as we have already pointed out, in the case of

*Alloway* v. *Nashville,* supra, the damages to be appre-
hended from the mere propinquity of the erection must
be considered in estimating the incidental damages.
. . . We need say no more than we have already said
as to the overwhelming weight of authority in other
jurisdictions as to the propriety of considering'' such
a matter and ''all that it reasonably portends in the
way of direct injury to the property, and hence impair-
ment of market value. Indeed we think it would be an
impeachment of the fairness of our jurisprudence if the
rule were otherwise. It would be nothing less than
saying that our courts could, not only within our con-
stitution, but under a true conception of justice, compel
one of our citizens to surrender a part of his'' tract of
land to another, a public service corporation, without
an adequate return for the impairment of his estate,
so imposed, or that a man could be compelled to surren-
der part of his ''land for, say, the erection of a public
pesthouse, and receive no compensation for injury to
the market value of the rest of his tract. To exercise
such a power would be, not to administer justice, but
to inflict oppression. Moreover, it would deny and
destroy the very principle by which the courts profess
to be guided in conducting such matters—that the land-
owner should be considered as one willing, but not com-
pelled, to sell, and the condemnor as one willing, but
not compelled, to buy. No one can suppose that the
landowner would consent to sell a specific part out of a
tract without considering how the taking of that part
would affect the rest of the tract, and without exacting

compensation for the lessening of the market value of
the latter thereby.   He would do this, if left free to act,
by adding to the price of the part sold.   In condemna-
tion cases he cannot do this, but must look to the obten-
tion of a separate sum from the purchaser to cover
such incidental damage.   Can any one suppose that if
free to contract, he would demand anything less than
the whole damage to the market value of the land left in
his tract?   Can any one say his demand would not be
just?  . . .

"Having stated the principles which we think control
the controversy, we shall now inquire whether the ob-
jections made to the charge of the court are well
taken."

The response quoted above, in my judgment, begs
many questions involved in the point made by con-
demnors.

The response, if sound law, under our jurisprudence
cannot fail to strike with amazement all who read our
former decisions, and realize that of all the brilliant
judges and counsel whose names appear in our re-
ported cases not one has seen the force of the argument
embodied in the excerpt from the opinion of the major-
ity.   From the *Woodfolk Case,* decided more than sixty
years ago, to the *Hord Case,* decided in 1909, bar and
bench alike stand condemned of overlooking in the con-
struction of our statute the elements of incidental dam-
ages aforesaid.   And many worthy litigants, seeking
all their rights in condemnation cases, have gone forth
from a trial of their causes in our courts of justice with

only part of the full relief to which they were in law entitled. But, says the opinion of the majority:

"In several of our cases, the obvious physical inconveniences just referred to, and others like them, are mentioned as instances, but in no case are they held exclusive, or held out, or suggested as covering the whole field."

Now the question is, Why was the whole field not covered? It was the duty of attorneys for property owners litigant in condemnation suits to cover the whole field in their demands for their clients. It was the duty of the courts to cover the whole field in the construction of the statutes.

The opinion in the *Woodfolk Case* is devoted to a general discussion of the subject of the exercise of the right of eminent domain, as well as the subject of damages sustained by the landowner, incident to a taking under that right. The opinion in that case was rendered by Judge CARUTHERS. His associates were Judges TOTTEN and McKINNEY, all illustrious men. The case was presented to that great court by the most eminent counsel of that day. There is similarity in the character of the real estate involved in that case and in this. There, as the opinion shows—

"the defendants located their road for about five hundred feet on a six-acre lot of plaintiff in the vicinity of Nashville. The road runs through the corner of the lot, separating about three-quarters of an acre from the main lot. The plaintiff has his family residence on the lot, and it is handsomely and tastefully improved.

The part separated has upon it some negro houses, a cowhouse, well, and springhouse.''

The property in the present case lies in the vicinity of Nashville, was vacant before the taking, inclosed by a wire fence, and comprised fifty-six acres. A strip of it was taken, one thousand feet long, near the eastern margin of the tract, but leaving on the east side of the strip taken a part of the original tract containing three and twenty-one one-hundredths acres, and leaving west of the tract taken the remainder of the original tract, this remainder comprising fifty and forty-three one-hundredths acres. Before the taking this tract was irregular in shape; its east line was one thousand feet; its north line two thousand and two hundred and twenty-five feet; its south line, two thousand and two hundred and seventy-five feet. It had not been subdivided, but was acreage property.

All the elements of incidental damage were involved in the *Woodfolk Case* which could possibly be involved in the present case. There the proximity to the railroad line of all the land not taken was much greater than in the present case, and there the family residence of the owner was located on the part of the tract which was not taken, while in the present case there is no such thing. How happened it that no one in that great case, either lawyer or judge, observed the existence of the elements of incidental damage which are said to exist in this case by the majority opinion? I cannot believe that so great an oversight was made. I think the bar and court alike must have seen the distinction between an

incident of taking and an incident of operation, and that an incident of operation is a mere consequence of taking. Again I think they must have had in mind a principle so well expressed by another great judge in *Railroad* v. *Bingham*, 87 Tenn. (3 Pickle), 522, 11 S. W., 705, 4 L. R. A., 622, where, in speaking for the court, Judge Lurton said:

"The railroad company, in so far as its occupation and use of this street is permitted by its contract and the taxing district ordinances, is not a trespasser. What the law expressly authorizes is not unlawful, and cannot be regarded as a nuisance. The running of railroad trains along a public street devoted to residential purposes, and without any actual obstruction of the right of an abutting owner to light or air, or ingress and egress to and from his premises, may in most cases, be regarded as injurious to the property of lot owners. A resident upon such a street will undoubtedly be subjected to more or less discomfort and inconvenience by the mere passage of trains in front of his premises. Unpleasant odors and disagreeable noises at inconvenient hours are likely to be experienced. Life will not be altogether so comfortable. But does the law give damages for such consequential injuries? To entitle a plaintiff to recover damages there must not only be an injury, but the injury must be the result of some wrongful conduct. Where an injury results merely from the lawful and reasonable use of a neighboring estate, no wrong is done and no remedy exists. By the obstruction of a view, or of light, or of air, or by

the erection of an unsightly structure, or the conduct of a lawful business, injury may be inflicted upon an adjoining property; but, as remarked by counsel, 'in these and like cases there is an implied agreement by every one who is a member of civilized society that he will submit to such consequential injuries without action.' "

I am sure it was realized by both court and counsel in the *Woodfolk Case* that article 1, section 21, of the constitution went no further than to prohibit a taking without just compensation of private property for a public use. Indeed such was the express holding in that case. The court said:

"Here the constitutional provision ends; its inhibition upon the government goes no further."

And it was then pointed out that:

"The legislature may make any regulations it thinks right and proper for an account or estimate of incidental loss or damages or injuries to the landowner."

At the time that case was decided the legislature had only made "regulations" to the extent of allowing the landowner to recover for damages incident to the taking, and that is as far as that branch of the government has ever gone on that subject. Section 1844, Shan. Code, provides:

"Any person or corporation authorized by law to construct any railroad, turnpike, canal, toll bridge, road, causeway, or other work of internal improvement to which the like privilege is conceded, may take the real estate of individuals, not exceeding the amount

prescribed by law or by the charter under which the person or corporation acts, in the manner and upon the terms herein provided.''

Section 1856 of said Code reads:

''The jury will then proceed to examine the ground, and may hear testimony but no argument of counsel, and set apart, by metes and bounds, a sufficient quantity of land for the purposes intended, and assess the damages occasioned to the owner thereby.''

In the same Code, section 1857, is:

''In estimating the damages, the jury shall give the value of the land without deduction, but incidental benefits which may result to the owner by reason of the proposed improvement may be taken into consideration in estimating the incidental damages.''

We see, in section 1844, a purpose to take private property for public use, in section 1856 a purpose to have a jury of view assess damages occasioned to the owner by the taking, and in section 1857 a purpose to allow benefits resulting from the taking to be set off against the damages incident to the taking; but there is conspicuously absent from this legislation any evidence of a purpose to allow the recovery of damages by the owner which are not incidents of the taking, but are merely consequences thereof, and are of a character for which adjacent owners, no part of whose property has been taken, although they may suffer to the same degree, can have no recovery. I repeat, such a purpose is conspicuously absent from this legislation when it is fairly construed. No doubt the absence of a purpose in

this legislation to allow a recovery for consequential damages is attributable, in large part, to a recognition by the lawmaking department of the salutary character of those principles so well expressed in the excerpt supra from the opinion by Judge Lurton.

We cannot ascribe to the legislative department of our State ignorance of the construction which the highest court of the State has given to the existing legislation on this subject; and therefore it is fair to assume that this department of the State still entertains the view that it is not wise to enlarge the rights of the landowner so as to allow him to recover for consequential damages.  The majority opinion in this case in effect performs the office of an act of the legislative department of the State, and with all due respect to the majority I maintain this court to be wholly without power so to act.  Its legitimate function is the construction of legislative acts, but as there is no legislative act authorizing a landowner to recover consequential damages, the court oversteps the legitimate function of construction and passes into the zone of judicial legislation when it declares such right to exist; and, in so doing, as I see it, runs counter to article 2, sections 1, 2, of our constitution, by which the powers of the State government are distributed into three distinct departments, and a person or persons belonging to one of these is forbidden to exercise any of the powers belonging to either of the others except in cases by the constitution directed or permitted.  The present is not one of the excepted cases.

A landowner, part of whose land has been taken for a public use, has enjoyed the full measure of relief afforded to him under our constitution and statutes when he recovers in money, lawful coin of the United States, the fair market value of the land actually taken, and the net amount of damages incident to (but not consequent upon) the taking. This was the measure of his right laid down in the *Woodfolk Case*, and the doctrine of that case on this point has never been questioned in all the more than sixty years since its announcement.

The landowner cannot enlarge his right. It has never been enlarged by the constitution. The legislature, in its wisdom, has not seen fit to enlarge it, nor is it enlarged by the common law, for, as said by Judge Lurton in the *Bingham Case*, supra:

"In these and like cases there is an implied agreement by every one who is a member of civilized society that he will submit to such consequential injuries without action."

See *Railroad* v. *Bingham,* supra; also *Harmon* v. *Railroad*, 87 Tenn. (3 Pickle), 614, 11 S. W., 703; *Chattanooga* v. *Dowling,* 101 Tenn. (17 Pickle), 342, 47 S. W., 700; *Brumit* v. *Railroad,* 106 Tenn. (22 Pickle), 124, 60 S. W., 505; *Terminal Co.* v. *Jacobs,* 109 Tenn. (1 Cates), 727, 72 S. W., 954, 61 L. R. A., 188; *Terminal Co.* v. *Lellyett,* 114 Tenn. (6 Cates), 368, 85 S. W., 881; *Gossett* v. *Railroad,* 115 Tenn. (7 Cates), 376, 89 S. W., 737, 1 L. R. A. (N. S.), 97, 112 Am. St. Rep., 846; *Coyne* v. *Memphis,* 118 Tenn. (10 Cates), 651, 102 S. W., 355.

The damages for which the majority opinion allows recovery are not based on some special injury done to

the remaining part of the tract by unskillful or negligent construction, or negligent operation, so as to fall within the exception noted to the general rule by the cases aforesaid; but the majority opinion approves the charge of the trial court which told the jury, among other things:

"But everything necessarily connected with and directly and proximately resulting from the taking of the right of way strip, and the proper and careful construction and operation of this railroad, which has the effect of directly and especially reducing or pecuniarily damaging the fair cash market value of the remainder of the land taken, are to be considered by you in awarding incidental damages to the remainder of the land not taken, and the mere fact that other pieces of land lying in similar proximity to the railroad, and no part of which is taken, suffers similar damages to that especially resulting, as aforesaid, to the remainder of the tract of land in question constitute no reason or excuse why you must not award such incidental damages to the remainder of this tract of land not actually taken."

In another portion of its charge, the court told the jury:

"Then you must take into consideration the necessary danger and peril from sparks or fire from trains while on said strip, and the necessary noise, smoke, soot, cinders, escaping fumes, and vibrations so resulting."

This charge promotes consequential damages. It moves them up a step higher than that plane on which they have been supposed to rest during the past sixty years of the judicial history of this State. It places consequential damages upon the same plane as incidental damages, wholly ignoring the manifest distinction between an incident and a consequence of the act of taking, and overlooking a discrimination thus made between the landowner whose land is taken, leaving him the owner of adjacent property, and other adjacent landowners whose property may be equally or more seriously damaged by the taking, but who nevertheless can have no recovery. These distinctions, however, which the charge overlooks have never been overlooked by this court heretofore, and manifestly have never been overlooked by the lawmaking department of the State. It is affirmatively shown by the transcript, as I see it, that the major part of the large verdict in this case was based on consequential damages pure and simple. I find no warrant under the common law, under our statutes, or under our constitution, for affirming a judgment based on such a verdict.

The opinion of the majority cites cases from other jurisdictions, many of which no doubt rest on statutes and constitutions entirely dissimilar to ours. In respect of such authorities, Judge Caruthers said, in the *Woodfolk Case*:

"Though we entertain very great respect for decisions of other States, we cannot yield to them as au-

thority any further than they are sustained, in our judgment, by sound reason and settled principles."

He also spoke of the diversity in the views of other courts, which then existed, in respect of the questions he had discussed, in that opinion, as a reason for basing the decision of the court upon our own constitution and legislation rather than having resort to authority from other jurisdictions, resting upon dissimilar constitutions and statutes. In substance, the same observations have been made in other of our cases.

By the opinion of the majority a venerable rule of law in this State is given its *quietus*. Hail to the new rule! Its virgin fruits are great! Note them: Less than two years before the taking by the condemnors of two and thirty-one one-hundredths acres of land out of a tract of fifty-six acres, the owners of that tract were willing to sell the entire tract at $30,000. Evidently no purchaser was found willing to pay the price, for the then owners still hold fifty-three and sixty-nine one-hundredths acres of the tract. The jury awarded damages in the circuit court for the two and thirty-one one-hundredths acres actually taken in the sum of $5775, and for incidental damages to the land not taken the verdict of the jury was $32,000. The judgment based on this verdict in favor of the owners was for the sum of $37,775, together with interest in the sum of $5452.20. When the case was affirmed by the court of civil appeals, the total judgment was for $45,107.57 and costs. Interest has been accumulating since the date of that judgment. The owners were, of course, entitled to the

interest if they were to the principal; but were they entitled to so large a principal?

For the owners it is said that between the date when they were willing to sell this property for $30,000, and found no purchaser for it at that price, and the date of the taking, a public park was established adjacent to the tract, and greatly enhanced the value thereof. No doubt the establishment of the park did enhance the value of the tract, but I do not believe its fair market value was so enhanced as to justify the conclusions reached by the jury. The evidence as to the degree of enhancement was greatly in conflict, yet, under the new rule, after the public had enhanced the value of the tract by the establishment of the park, a further burden is imposed upon the public. Ultimately the burden of the judgment in this case falls upon the public. The public pays the freight and passenger rates of common carriers, and these rates must be so fixed as to care for burdens so imposed; else common carriers must cease to exist. The public merely cajoles itself by specious reasoning when it supposes such burdens to be destined for other shoulders than its own. The public, by the verdict in this case, under the new rule, relieves these landowners of their fair share of a public burden. It allows them a recovery for consequential damages for which other adjacent landowners can have no recovery, though they may suffer loss in the value of their property to the same degree, and even greater degree, than these landowners.

For these reasons I respectfully dissent from the opinion of the majority, I might mention others, but *cui bono*.