MEMPHIS HOUSING AUTHORITY, Petitioner-Plaintiff-in-Error, v. DEASE H. RYAN et al., Respondent-Defendants-in-Error. —393 S. W. (2d) 3.

Western Section. December 10, 1964.

Certiorari Denied by Supreme Court June 7, 1965.

558

Hugh Carney and Melvin Fleischer, Memphis, Cochran & Carey, Memphis, of counsel, for plaintiff in error.

Lucius E. Burch, Jr., and David E. Caywood, Memphis, Burch, Porter & Johnson, Memphis, of counsel, for defendants in error.

AVERY, P. J. (W.S.). This case involves the value of a small lot taken by the Memphis Housing Authority belonging to Dease H. Ryan et al. Briefly the facts as stated in the brief supporting the assignments of error are:

Subject property is known as 752 Washington, Memphis, Tennessee. It was taken February 9, 1962. It is also known as Parcel 8-19 of Medical Center Urban Renewal Area, which includes quite a large area in the City of Memphis, Tennessee, lying generally between Poplar and Union Avenues and includes some property on both sides of Washington, Adams, Jefferson, and Madison Avenues, and the many streets and shorter avenues within said area. It's shape is a parallelogram measuring 50 x 165 feet at a slight angle, in area 8,091.6 square feet. On it is

an old two story frame dwelling estimated at sixty to seventy-five years of age, the lot fronts on Washington Avenue and is zoned 5-R residential, as is the other property in that block facing Washington Avenue. In the rear is an alley north of which and fronting on Poplar in that block the property is zoned commercial. Across the street the entire block is zoned R-5 residential. The block east of same fronting Washington Avenue is zoned R-5 residential.

Petitioner deposited $15,200.00 representing what it had determined as a fair value. A jury of view valued subject property at $17,500.00. The case was tried to a jury and Honorable Greenfield Polk, Judge, and the jury returned a verdict of $30,000.00.

Appellant's statement of facts shows as follows:

"The property owner testified the property was worth $60,000.00 in his opinion. J. W. Orr, offered by the property owner as a real estate expert, testified the property was worth $38,855.00 in his opinion. Certain sales were also introduced in the case on behalf of the property owner as comparable sales. The petitioner offered Mr. William Tate and Mr. William Brown as its real estate experts, the former testifying to a value of $16,400.00 and the latter testifying to a value of $15,850.00. Petitioner also offered several sales as comparable to subject property."

Motion for new trial was seasonably made. A stipulation for "Abridgement of Record", omitting the formal paragraph, is that the record on appeal shall be:

"1. Petition for condemnation filed January 16, 1962;

2. Order Divesting and Vesting Title etc. entered February 9, 1962;

3. Answer filed February 23, 1962;

4. Answer of unknown heirs etc. filed July 26, 1962;

5. Report of Jury of View filed August 14, 1962;

6. Order of Jury Verdict entered February 12, 1964;

7 Motion for New Trial filed February 19, 1964;

8. Order Overruling Motion for New Trial entered March 6, 1964;

9. Stipulation as to Exhibits on Appeal filed and entered March 26, 1964;

10. Bill of Exceptions;

11. This Stipulation."

There are eight general assignments of error with assignment No. 5 divided into five sections.

We do not deem it necessary to copy these assignments of error. Assignments of error 1, 2, and 3 are levelled at the action of the Court in admitting as comparable sales (a) Miller to CBA Development Company; (b) the sale of Lentz to Esso Company; and (c) the sale of Holland to Lee.

Assignment of error No. 4 is levelled at the action of the Court in excluding from the testimony of one Ledbetter the sale from Memphis Housing Authority to Medical Center Redevelopment Corporation and from Memphis Housing Authority to Corondolet on the theory that these sales were comparable to the involved property.

Assignment of error No. 5, the Court erred in not granting petitioner's motion for a new trial because:

(a) Over objection the Court permitted counsel for respondent to display before the jury in his argument a mathematically incorrect formula for ascertaining average footage. (Exhibit 2—yellow sheet).

(b) Permitting misleading and incorrect formula for arriving at the value of property averaging appraisals given on behalf of respondents. (Yellow sheet—Exhibit 1.)

(c & d) Argument to the jury by counsel for respondent to the effect that if error is made on side of petitioner loss would be only a fraction of a mill to a taxpayer, whereas if the error made otherwise would fall on defendant alone, and that property owner could not possibly be a winner because of expense of attorney and appraiser fees.

(e) Counsel for respondent reading from an appellate court opinion in his argument. Opinion in case of Riley v. District of Columbia Redevelopment Land Agency (1957) 246 F.(2d) 641.

Assignment No. 6 is that there is no material evidence to support the verdict.

Assignment No. 7 is that the verdict is excessive and the result of sympathy, prejudice, or unaccountable caprice, and from the statements and attitude of the Court said that this was "particularly in view of the Court's admonition of Orelle Ledbetter (witness and official of Memphis Housing Authority) charging him with 'playing semanics'," and in a loud angry manner.

Assignment No. 8: The Court erred in not granting motion for a new trial because the expressions of the Court to the jury sustaining objection to testimony of

Ledbetter, impressed the jury with the thought that the trial Judge felt that Mr. Ledbetter and the Memphis Housing Authority were trying to mislead the jury and were not acting sincerely, honestly, etc.

There is no necessity to make any particular quoted reference to the pleadings in this case because they are compiled in the regular way in such cases.

 We first take up assignment of error No. 6 with respect to material evidence. It is obvious that this assignment must be overruled. There is competent evidence by each party, directly and circumstantially, and by comparison of sales of comparable property, with respect to its value. These estimates by competent witnesses have wide differences of the value of the involved property. While the burden is on the property owner to establish its reasonable market value, the minds of reasonable men could well disagree as to their verdict relating to value of the involved property and, therefore, a purely fact question as to value was practically the only jury question. So it is on such assignment as relates to the verdict of the jury there is no necessity to refer to authorities, they are in the multiples of hundreds on this question. In the absence of any other reversible error in the case, the verdict of the jury must stand. Therefore, this assignment is overruled.

We next give consideration to assignments of error No. 7 and No. 8 together, because they jointly relate to the testimony and action of the Court thereon, given by Orelle Ledbetter, and objection to same by counsel for respondents, and the statements of the Court in connection therewith.

The testimony of Mr. Ledbetter was begun in the morning. By him the petitioner undertook to introduce the sale by the Memphis Housing Authority to the Corondolet Company. Orelle Ledbetter is the Assistant Director of the Memphis Housing Authority, and stated that his connection and work with the Memphis Housing Authority was "real estate development" and as such he handled the sales of the Memphis Housing Authority. He then stated that Memphis Housing Authority sold a piece of property which it had obtained, to Corondolet Company, lying between Washington and Adams and along Manassas in the City of Memphis, and on which lot was being constructed at the time of his testimony, a "high-rise apartment building" and he said that this area was zoned R-5 residential by the zoning authority of the City of Memphis.

Counsel for the petitioner then asked what the purchase price of that property was, and at that point counsel for respondent objected, and requested an opportunity to examine this witness before making his final objection, and the Court granted him permission to cross examine the witness. The witness said that the Memphis Housing Authority acquired that property "under the threat of an eminent domain procedure to acquire it." His exact statement is in response to the following question:

"Q—You acquired it under the threat of eminent domain or by eminent domain?

A—Under the threat of it, yes, negotiation.

Q—You took that property from private owners and then resold it to another private company?

A—That is correct."

This witness explained that the Memphis Housing Authority, in its resale of property acquired under and by virtue of the Federal authority for such purchases, there were certain restrictions and that an entire area was included in such purchases paid for partly by the City of Memphis and partly by the Federal Government, for specific purposes of planned development. He was asked and answered:

"Q—State whether or not when you resell this property that you acquire from these home owners for private development, whether or not you actually sell it as a free and voluntary transaction, or whether you do not attach strings and conditions upon the purchaser? You won't sell it for any purpose, will you?

A—It has to be developed in accordance with the plan."

He explained that it had to be developed by purchaser after being acquired in accord with prior plan agreed to by purchaser of the property and the Authority, but also subject to the zoning regulations, all of which likewise had been fixed prior to the sale, and subject to the building restrictions specified by the authorities of the City of Memphis in accord with the redevelopment plan. He was then asked:

"Q—Now, your testimony is that this property that you are about to testify to, you acquired under threat of eminent domain from private owners and then resold it to Corondolet Corporation with a limitation as to what its use had been in 1963; that is the substance of what you are about—what you have told us, is that correct?

A—Yes."

At that point counsel for respondent, Mr. Burch, made the following objection:

"I object to the testimony, if Your Honor please. It is not a free and voluntary sale. Furthermore, while I am on my feet, the element of time, if there is nothing else in it, would negate it."

Then there followed a controversy between the lawyers and the Court covering several pages. The witness was passed back and forth for further direct and cross examination many times. The Court became involved in the statements that were being made by this witness and the argument resulting between counsel and began to ask the witness questions, all of which, including his statements to counsel, and to the jury as to this witness, occurred in the presence of the jury. Just before adjournment for lunch the Court overruled the objection made by Mr. Burch. After lunch the examination was resumed with respect to this witness, both on direct and cross examination.

We have carefully read the examination of the testimony of this particular witness as it went back and forth between counsel for petitioner and respondent, as well as the Court, which clearly indicates that this particular witness was evasive in many of his expressions, was not clear in his statements, and which indicate that his effort was to prevent a plain explanation of the method, manner and way the Memphis Housing Authority restrictions relating to plans required in sales of property it acquired. The record of the testimony of Mr. Ledbetter and manner of explanation, begins on page 145 of volume 3 of this record and includes over 100 pages. Its substance is that the planners of the area which is being taken under

the Urban Renewal Plan by the City Housing Commission determined:

"what was best for that particular area. It had to be approved by the City Commission, the Planning Commission and Urban Renewal Administration".

The usage of the property involved grows out of a joint determination of all these authorities, and must have the approval of all of them before being offered for sale and must fit into the entire plan adopted and made out for the area.

The Court permitted the plat for what is determined to be the "Medical Center", which included the particular lot involved, to be introduced over the objection of counsel for respondent. Likewise a copy of the contract with Corondolet was introduced, with the further stipulation of the Court that these particular documents would be photostated and the originals withdrawn.

Under no condition could the property within the Urban Renewal Area be bought by any purchaser for speculative purposes; that the purchaser had to set out the use for which he was going to develop it and had to develop it in accord with that particular stated use, or at least that was the requirement up to the time of the purchase. Just before the adjournment for noon Mr. Burch renewed his exceptions to the introduction of this particular sale of property by the Memphis Housing Authority, and in the conversation just immediately after the noon recess, the Court said:

"I have not acted on Mr. Burch's renewal of his motion to exclude, but I have allowed you to interrogate further in view of his motion to again exclude this

testimony. You may ask him along that line or any other line you see fit.''

Questioning this witness revolved around changing of the requirements etc. in connection with certain property and the Court apparently concerned at the way and manner this witness was answering questions with respect to individual property in and constituting the whole area, that sometimes the highest restriction was occasionally removed after purchase from this Housing Authority, for specific purposes, and in the course of this examination the Court asked:

''THE COURT: Did you have to modify your requirements in any way in order to make this purchase attractive to the Corondolet people?

THE WITNESS: We exempted the height restriction. It is still controlled by City Zoning, but we took ours off.

''THE COURT: You took it off?

THE WITNESS: Off the entire area.

''THE COURT: Was that done as an inducement to get Corondolet to buy this porperty?

THE WITNESS: No, there were other sales prior to this.

''THE COURT: What other sales?

THE WITNESS: One referred to earlier here.

''THE COURT: The Tiffany property?

THE WITNESS: Yes.

"THE COURT: And you did it incident to the Tiffany transaction?

THE WITNESS: It was done to the whole area.

"THE COURT: I will start my question over again. In order to induce the Tiffany people to buy the Tiffany property that they bought, you changed the height requirement from what it formerly was to another height or no restriction at all; is that correct?

THE WITNESS: No, not to induce them. Just to make the area more attractive for that type development which meant they would have shops on the main floor.

"THE COURT: Didn't the instance of the Tiffany transaction bring this about?

THE WITNESS: I suppose the discussion with the developers brought it about.

"THE COURT: It has been intimated by a question put to you by Mr. Burch this morning, that that could have happened. Now, I want to know did it or didn't it?

THE WITNESS: It did not from these individuals. Some other developers in the trade.

"THE COURT: If you are going to play semantics with me—from developers in the trade or from discussions had with anyone, were these restrictions brought about?

THE WITNESS: Yes."

Much more of this type of examination could be quoted, but it seems to be unnecessary, for by this witness it is clearly shown that the Memphis Housing Authority Sales are not made as free and voluntary sales by a seller that would sell but didn't have to and a buyer that would buy

but didn't have to buy. Now restrictions in connection with the whole situation takes it out of this type of free and open purchase and sale, and from the exhibits that were introduced dealing with the method and manner that the Memphis Housing Authority had proceeded to resell some of its property to individuals, these exhibits 1 and 2 to the Ledbetter testimony contain the following clauses:

"Whereas, the purchaser hereby offers to purchase that part of the land of the Project described herein, and further offers to redevelop such land for the uses specified in the Urban Renewal Plan, and more particularly, in the manner set forth in the proposal and plans submitted herewith;

"Purchaser will submit final plans and specifications for the redevelopment to the seller for approval within 180 days of the execution of this contract. Seller will approve or reject the plans and specifications within 30 days of submission. In the event that the plans and specifications are rejected because of variations from the preliminary plans and specifications, purchaser shall be liable to the seller under subsequent sections regarding breach of contract, unless purchaser eliminates such variations.

"It is understood and agreed that one of the valuable considerations moving to the seller in this transaction is the construction by the purchaser of certain improvements on the within described land within a certain time. The purchaser agrees to develop and improve the within described parcel of land and to erect and construct thereon improvements in accordance with the plans and specifications therefor, as approved by the seller, and construction to be commenced by the

purchaser not later than the ―――― day of ――――, 19 ―――― and completed not later than the ―――― day of ――――, 19――――.''

Near the conclusions of this matter with respect to the competency of this evidence relating to the sale by the Memphis Housing Authority to Corondolet and the other mentioned by the Court above quoted, the Court said to the attorneys, to the witness and to the jurors:

''Gentlemen, I am going to do this and tell you very frankly why I am doing it. I am going to reverse the ruling I made before lunch, because during the lunch hour I have reread this charge I must give to this jury, I have heard more from Mr. Ledbetter. I have given it more mature thought. I am frank to admit to you I was about to make a mistake in my judgment. I don't mind admitting it. The best way is to correct it.

''I think Mr. Burch's objection is well taken and I am going to sustain his motion to have this proof of this sale excluded. In my opinion, his point is well made.

''You may have your exception, Mr. Fleischer and Mr. Carey.

''That is the final ruling of this Court on this proposition. Let us proceed.''

He then said to the jury:

''Gentlemen, in keeping with that ruling, anything that may have been said with regard to what this property sold for when it was sold by the Memphis Housing Authority to Corondolet, I will ask you and I will poll you as one member after the other, if you can and will disregard it and not consider it as evidence. Can you and will each of you?

"I think I would be in error if I did that and the candid thing for me and the fair thing for me to do is to admit it after giving it full consideration, and I am so doing. You can have your exceptions.

"Let the record show that the jury was completely polled as to whether or not they will abide by the ruling of the Court and disregard that testimony, so much of it as they were permitted to hear under the previous ruling."

■ It is admitted freely by counsel for both parties that the admission in an eminent domain case of comparable sales rests largely in the discretion of the trial Court, but that trial Courts will not have unlimited discretion in such matters, and in support of that statement they cite the case of Lewisburg & N. R. Co. v. Hinds, 134 Tenn. 293, 183 S.W. 985, which is a 1915 opinion approving that part of the Supreme Court in Union Railway Co. v. Hunton, 114 Tenn. 609, 88 S.W. 182, in which both of the Courts held:

"The propriety of allowing proof of sales of similar property to that in question, made at or about the time of the taking, is almost universally approved by the authorities.

\* \* \* \* \* \*

"\* \* \* the discretion of the trial judge is not unlimited in such matters, but will, in proper cases, be reviewed by the appellate court."

■ And while that is true, in the examination of an alleged comparable sale, it is not required that it be exactly comparable, but that it must be similarly, that is, it need not be identical but it may be a similar piece of property, similarly located of a similar type, kind,

area, etc., with many conditions and requirements as relate to specific pieces of property, all properly entering into the question of whether or not the sale is a comparable one made on the free and open market.

In Railroad v. Hinds and Union Railroad v. Hunton, supra, many cases from other jurisdictions and leading text on Eminent Domain, including Lewis on Eminent Domain, which the opinion approves, saying:

"* * * with which the trial judge is usually conversant, and they must rest largely in his discretion. Section 662 (3rd Ed.) pp. 1139, 1140."

■ We can not agree with the statement of counsel for the petitioner with respect to the effect on the jurors of the Court's statements to the jury in this particular case. While they are quite voluminous, there is nothing in them to show any angry or boisterous manner on the part of the Court, revealed by the record, and we do not think that what the Court has said is indicative of the fact that he was trying to prejudicially persuade the jury in regard to value of the involved property. He was exercising a discretionary right and since he was reversing his decision of that morning he felt the need to make an explanation regarding his own action.

We differ with counsel in these particulars. We are fully conscious of the fact that these Urban Renewal procedures, authorized by the Federal government and the State under the Housing Administration law, slum clearance etc., have brought into our nation a situation which does not represent either a voluntary purchase or voluntary sale on the open market so as to make one sale comparable to another. Certainly zoning laws are admissible, legal and proper in many respects, but we often

have cases in our courts dealing with the arbitrary action of Zoning Commissions and building restrictions, one way or the other.

■ Thus it is a matter of common knowledge, which we judicially know, that when you put in the restriction requirements and regulations that are laid down by three to five different governing authorities relating to the sale, purchase and use under eminent domain of real estate, largely does away with the comparable property relationship rule of law which we have heretofore applied in eminent domain cases. That is when the seller nor buyer have no restrictions other than those which are generally considered in all the markets of property within a municipality, and particularly is this true where property is acquired under threat of taking by authority of eminent domain, and which amounts to nothing less than forced sale. It is known as a matter of common knowledge that there are public offers of sale by these particular authorities, bid requests, etc., the purchaser is required to comply with regulations which the authorities themselves see fit to place upon such sale which removes it from the usual free and open market sale rule, regardless of its similarity otherwise.

We are also not of the opinion that what the Court said, when read in the light of the dialogue that was taking place when he made the ''playing semantics'' remark in any wise left an inference with the jury that the Court was attempting to influence either of them one way or the other in their verdict, or the amount thereof.

■ We do not understand either, that the Court acted arbitrarily in rejecting or admitting the reference to comparable property sales. Certainly the profit motive is one element to be considered. Investments by people

and concerns in this day and time, looking to the future development of certain areas they think will increase in value, under normal conditions, and the prospect that inflationary activities will increase the future price of property, influences the purchase price. To remove possibility of sale for profit by restrictions of the character here involved would destroy a valuable element which otherwise enters into the normal sale of property.

Therefore, for the same reasons as hereinabove stated with respect to assignments of error 7 and 8, applies as fully to assignment of error 4 (four), and so we feel compelled to overrule assignments Nos. 4, 7 and 8.

Passing now to the questions raised by assignments of error 1, 2 and 3. Much of what we have said with respect to disallowing the similarity of the sale to Corondolet, and the reasons therefor, apply to the same questions raised by these three assignments of error, in that the trial Judge has a large discretion in determining whether or not to permit certain alleged comparable property sales, similarly situated et cetera, to be used and to determine whether they are comparable or not.

■ In this first assignment relating to the Miller property as comparably competent, we look at the plat filed as evidence in this case, and observe that this Miller property is 742 Adams. On the objections to the admissibility of the Miller property sale raised by counsel for plaintiff-in-error, is that the size is not similar. The location is similar. True, it is a small area, and when you look at the description of this small lot only 15 x 55 and its location, which sold for $4,500 in July 1960, you immediately inquire, where is the similarity? Mr. Miller, who once owned and sold that lot which was no part, at that time, of any redevelopment area nor property then

being bought or sold by the Memphis Housing Authority, states such sale would likely enhance the value of his other property. The petitioner, it seems to us, is not justified in objecting to this sale. A person who owns property and who felt to sell a small portion of it would enhance the value of his other property, would more likely take less for it than he would if he had an idea there would be some damage to the balance of his property, and when this is all explained by Mr. Miller the jury could well make a comparison, and particularly as to values of square footage of property located in this immediate vicinity of the involved property.

The prime objection, as we understand the petitioner, to that which is referred to as the property sold by Lentz to Esso, it is said that it lies along a thoroughfare, is zoned commercial, while the involved property fronts along a narrow street and is zoned residential. This lot was 40 x 150. It sold for $22,500. Exhibits 3 and 4 to Orr's testimony shows the involved property in a photograph, Exhibit 3, and adjoining residence in Exhibit 4. Viewing Exhibit 3 you see the Esso station property, that is, you see its location. If zoning was the only problem to be considered in connection with the property the jury could well relate that particular sale as comparable at the time the Esso property was sold. These photographs show that the involved property, at that time, was located very closely to this area zoned commercial on which the Esso station was erected. Though so zoned the jury could take into consideration that at that time the property involved was not under any restrictions from the Memphis Housing Authority with respect to its use after sale. Though zoned differently, we feel the jury, for comparable purposes, could easily reconcile the difference.

The property referred to as the Holland to Lee property is located at 818 Washington. It is 34 x 142 feet. Mr. Gallagher who is Assistant Vice President of the Mid-South Title Company, offered the evidence as to this particular property. There was nothing to prevent the jury from getting a full picture of the location of this property and its relationship to the involved property.

In every one of these cases in which comparable property or alleged comparable property was introduced, the trial Judge saw and heard the witnesses testify and so did the jury. The trial Judge having a wide discretion to determine comparability of properties reasonably is in better position to understand the weight he is going to give to the testimony, and the consideration the jury will give it under his instructions. While one piece of property may be considerably different in size, shape, situation and immediate surroundings as it relates to another, when all of these are particularly explained to the trial Court and to the jury, which was done regarding these three particular pieces of property offered as comparable by respondent which the trial Judge permitted to go to the jury, under the facts as proven, we feel extremely hesitant to find that there has been such abuse in discretion on the part of the trial Judge to render the evidence relating to them improper, and do not do so. We see no need to quote further from the text relating to procedure, evidence, et cetera in eminent domain cases. We have hereinbefore referred to Lewis on Eminent Domain and have stated, in substance, what was said with which other texts on the subject agree.

As to the property the Holland to Lee sale, 818 Washington, it is said that the documents introduced showing

this sale, being a sale closure by the person in custody and under whose supervision the documents involved in this sale were compiled, amounts to hearsay only in that the petitioner was not given an opportunity to cross-examine the person who actually made up these documents, thus they say the Court erred by letting incompetent evidence go to the jury. These records were shown by authority of the Uniform Business Records Evidence Act, T.C.A. sec. 24-714 as follows:

"A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. (Acts 1957, ch. 154, sec. 2.)"

It is further said that the general principal of law applicable to evidence of this character is found in Am. Jur. Section 1051, at page 893:

"The admissibility of books of account is in the first instance a question for the trial court, to be determined upon the preliminary proof made as required either at common law or by the statute. The court's determination of the sufficiency of such preliminary proof will not be disturbed unless there has been an abuse of discretion."

██ ██ Again it is said the witness by which these documents were offered did not possess the actual knowledge of the transaction. While that may be true, the plats, the exhibits, the testimony in this record is such

showing locations etc., that the trial Court and the jury could and did have a complete and proper understanding of this evidence and what this testimony meant. Again it is largely in the discretion of the trial Court to determine whether the proffered witness is the correct one to introduce such documents. It is a matter that all the Courts are familiar with that this Uniform Business Records Act was enacted so as to make such evidence competent without having to resort to the many problems involved in going and procuring the person who actually made every figure and word contained therein to be present to make it competent. In many instances many people have had to do with the same sort of document. They have checked it for accuracy, they have made up a part of it themselves, it passes through the hands of the persons responsible for compiling it, much as a piece of equipment would go down a long assembly line, set together by different parties and come out the other end a perfected piece of equipment. So it is that the person in charge of these documents may present them, carrying the presumption that they are correct in the absence of something to prove that they are not. Certainly we could not affirmatively say, even if we were to hold it was not proper to introduce this document, that this evidence referred to in this objection, adversely affected the verdict of the jury. T.C.A. sec. 27-116.

Therefore, we overrule assignments of error 1, 2, and 3.

This brings us now to the question raised by assignment of error No. 5. The first section of this objection relates to introduction of Exhibit 2 by counsel as a ''mathematically incorrect formula'' because total square footage of the referred tracts related to the sale price

showing the individual and collective value per square foot was shown to and used in argument to jury.

Mr. William M. Tate was recalled to testify further on direct examination by the petitioner, at which time counsel admonished him that the Court had excluded the testimony of the witness Ledbetter and requested Tate not to refer to any prices that came about by reasons of sales made by the Memphis Housing Authority. Then counsel said:

"But if you will, please, sir, you have, I think, computed, based on the prices that are in the proof, the sales price of the various comparables that we have heretofore shown to the jury by pictures.

"Tell us, if you will, please, sir, what the property sold for on a square-foot basis in the sales to CBA Development Company from Allenberg, the property at 751-749 Washington. I believe that took place July 29, 1959."

The witness then asked the question, what order to present that proof, and counsel responded:

"Q—Take them in any order you want to.

A—That was the Mittman residence. They were living there at that time. It was a two-story frame building on a corner lot."

At that time Mr. Carey passed the photographs of property he was about to inquire and suggested to witness to hold them up so the jury could see them. The witness began then to give the number of square feet in these respective properties, and as to this particular piece of property he said it contained 19,800 feet and that it was sold for $38,000, then said:

"Which would indicate something under $2.00. I think it figures out to $1.92 per square foot for the land.

"This is directly across and slightly to the east of the subject property. 749 and 751 Washington, which was a vacant lot, unimproved, was sold by Julian Allenberg to the same CBA, Russell Hendrix, Trustee. The total square footage of this lot was 8,305 square feet, sold for $14,500.00 on August 25, 1959, for an indicated square foot value or price of $1.74."

He then made reference to the property at 729 Washington and stated this was an unimproved lot at the time it was sold and it was bought for use in connection with some apartments as an area for parking and he said:

"the lot was 13,054.58 square feet. It was sold by National Bank of Commerce, Trustee, to Robert H. Higgins, $11,400.00, which gives you a square foot price of $.873."

He then referred to a lot at 731 Jefferson, stating that it was an improved piece of property but that the improvements were not tenable without a great deal of work being done, and he said this property contained 9,533.7 square feet, transfer price was $19,000 on May 8, 1959 and the witness said it was sold to Mr. Lucius Burch and Mr. John Porter, which he said is an indicated price of $2.00 per square foot or $1.99 minus to be exact. He explained these two last mentioned properties were zoned C-3 commercial.

The witness then said of the property at 727 Jefferson that it had the same type of unimproved building as the one immediately referred to above, and that it contained 6,058.8 feet and was transferred at a price of $10,500 or $1.62 per square foot.

The witness then was told that the last piece used as similar property was the southwest corner of Adams and Orleans. He said it was unimproved, a vacant lot, containing 22,275 square feet, and sold for $30,000 on May 30, 1959, indicative value of $1.30 per square foot.

Then the purpose of this whole examination with respect to these properties is brought out in the next question, which is:

"Q—Now, Mr. Tate, are these the properties generally that you considered when you arrived at your appraisal of the subject property?

A—The first properties that I gave you, Mr. Carey, on Washington were, because of their proximity to the subject property, because of their comparison identity, because of the fact that they more nearly satisfied the value that we were trying to ascertain."

The witness then stated that a survey had been made of the entire area with respect to the properties in arriving at their respective values in the first instance. He went quite comprehensively into a statement with respect to quite a few other sales in the survey made in arriving at the values he gave of the involved properties and said that he had something like 95 to 100 pieces of property involved in the range all the way from unimproved lots up to Chip Barwick Chevrolet and things like that, and then he was asked:

"Q—Now, you have told the jury that there were three methods, generally-accepted methods of making appraisals. How did you arrive at your appraisal of the subject property?"

He made a long explanation of how he arrived at it and explained the methods referred to, stating that he had built and sold houses and that he had had considerble experience in construction, appraisals etc.

The witness was cross examined and testified in substance just about what he had said on direct examination as to methods, comparisons etc., and explained that there had been some increase in the value of property since his first appraisals, and on the subject property the sum of $1150.00 would represent a fair increase in its value from that he had first reported.

In the course of his cross examination with respect to his statements relating to the properties which he considered and accepted the price as comparable etc., his attention was called to what he had said on direct examination about Mittman and property sold to CBA and was asked why he didn't tell them about the "little sale which occurred on the 7th day of the 5th month, 1960, in the same assemblage right across the street, for $5.45 per square foot, or didn't you know about that?" The witness explained that he didn't quote it because it occurred after the date of his appraisal of the involved property as of February 9, 1962, but he gave what he considered the enhanced value.

So it was in the argument to the jury and during the trial that these two exhibits which referred to the Mittman property as selling for $1.92, the Allenberg property for $1.74 and the Miller property for $5.45 per square foot, added together which made a composite total of $9.11 or an average per square foot of $3.04. Then Exhibit 1 which is complained about, was the Ryan value of $60,000 and the Orr value of $38,855 of the involved

property, which made a composite figure of the two valuations of $98,855.00 or an average appraisal of $49,427.50.

In the first place as to Exhibit No. 2 this was brought about by testimony which was introduced by the petitioner through Mr. Carey on direct and on cross examination by Mr. Burch, showing the average price per square foot values mentioned in Exhibit 2.

We refer now to the assignments levelled at these two exhibits. Since we have held that the trial Judge did not abuse his discretion in admitting the sales of the Mittman, Miller and Allenberg properties as compiled for comparison, we think the argument of respondents' counsel objected to, can not be held unreasonable. He simply illustrated the respective value of these properties, with that of the subject property on a square foot basis.

His argument relating to the value fixed by Mr. Ryan, the owner of the subject property, whose opinion as to value is authorized by law, plus the value fixed thereon by the realtor, Mr. Orr, and then making the argument that the sum of the two values divided by two would result in a value of so many dollars, could not confuse the jurors. It merely shows a result of a calculation as illustrative of different opinions, which calculation the jurors could have made.

It is admitted that there is a wide difference in the value of subject property by the jury of view, the trial jury, and the respective witnesses, but we do not understand that we are to consider the value as fixed by the jury of view when related to the testimony before the trial jury. However, recapitulating values as fixed by

all parties, witnesses and jurors, the record indicates the following:

| | |
|---|---:|
| Jury of View values | $17,750.00 |
| Respondent | 60,000.00 |
| Mr. Orr | 38,855.00 |
| Amount paid into Court on Report of Appraisers | 15,250.00 |
| Mr. William Tate | 16,400.00 |
| Mr. William Brown | 15,850.00 |
| Trial Jury | 30,000.00 |

We have often said in matters of fixing the value of property, injury, or the value in involved questions of property rights et cetera, the jury is the best forum to fix that value, and next to this particular forum is the trial Judge who heard the witnesses testify and saw their demeanor as they testified. While we are not bound by the values fixed by a jury, we hesitate to change it when, as here, value is their prime function.

We see nothing in this record that indicates the jury was impassioned by the proof from the witness stand or the action by the Judge, or anything he said, that caused them to go beyond the bounds of their own reason in arriving at their verdict. The remarks that counsel for respondent made and which are complained of are simply illustrative, and we see no comparison between the illustrations and such remarks held by our Courts, improper in personal injury cases relative to insurance, to the statement made by counsel in substance, that if the jury did undervalue the property of the respondent it would greatly harm him, while the petitioner who represented the great body of the people, would be numerically deprived of no value of any consequence because of some overvaluation.

We think there is no error and that the verdict of the jury, and judgment of the Trial Court thereon should stand. Consequently all assignments of error are overruled and judgment will be entered here, with cost, against the petitioner and in accord with this opinion.

Carney and Bejach, JJ., concur.